******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., concurring in part and dissenting in part. I agree with part II of the majority opinion and concur as to that part. However, I respectfully disagree with parts I and III of the majority opinion. In my view, General Statutes § 34-362 (b) requires that the partnership interest of the plaintiff, Thomas Brennan, be valued on the date of the trial court's judgment dissociating him from the defendant partnership, Brennan Associates (partnership).[1] Further, in my view, the trial court properly concluded that the defendants' attorney's fees should not be treated as a liability of the partnership. Before reviewing the facts that I believe are relevant to the present appeal, I set forth a brief summary of these conclusions.

In construing General Statutes § 34-355, the statute setting forth the causes of dissociation,[2] the majority places emphasis on the word "expulsion" in the phrase "expulsion by judicial determination" to conclude that only *after* the plaintiff had been de facto expelled from the partnership—by cessation of his management rights occasioned when this court ended the appellate stay in the prior appeal—was the plaintiff de jure dissociated from the partnership pursuant to § 34-355. General Statutes § 34-357, which is entitled "[e]ffect of partner's dissociation," specifically provides for the cessation of management rights as a *result* of dissociation and, therefore, such an event cannot be a *cause* of dissociation pursuant to § 34-355, which is entitled "[e]vents causing partner's dissociation." In my view, the majority's emphasis on "expulsion" is contrary to the statutory scheme which provides that the basis for dissociation is the conduct that led to the judgment of dissociation, not conduct thereafter on appeal of such judgment.

In my view, use of the term "expulsion" in § 34-355 is not dispositive of this issue as the majority would suggest. In subdivisions (3), (4), and (5) of § 34-355, "expulsion" relates to the events that give rise to a cause of action for dissociation of a partner, clearly referring to some type of wrongful conduct on the part of the partner with use of terms such as "wrongful," "breach," and "unlawful." See General Statutes § 34-355 (4) and (5). Contrary to the majority's interpretation, "expulsion" does not relate to the moment at which the already rendered judgment of dissociation becomes effective or enforceable after disposition of an appeal. My disagreement with the majority's analysis is that it construes the term "expulsion" in light of facts occurring *after* the judicial determination that dissociation was an appropriate remedy for a partner's wrongful conduct. Section 34-355 does not allow for the use of postjudgment events to justify the a priori judgment of dissociation.

Moreover, in my view, the majority's analogy to § 34-355 (7) does not support its position. Subdivision (7) of § 34-355 applies to dissociate a partner when he has a physical or mental disability that affects his ability to serve as a partner. Certainly § 34-355 (7) relates to a situation which is not the fault of the partner. Construing the term "expulsion" to prevent this innocent partner who has been dissociated pursuant to § 34-355 (7) from valuing his interest in the partnership prior to the time that any appeals have been disposed of would be inappropriate.

Additionally, the defendants' desire to value the plaintiff's partnership interest as of 2009 belies the positions they took in *Brennan I*, in which they wished to value the plaintiff's partnership interest as early as possible and while the previous appeal was pending before this court. See *Brennan* v. *Brennan Associates*, 293 Conn. 60, 89, 977 A.2d 107 (2009) (*Brennan I*). After this court issued its opinion in *Brennan I*, the defendants sent a letter to the plaintiff offering to purchase his interest in the partnership as of "the date of [the plaintiff's] dissociation . . . ." The defendants' letter indicated that the plaintiff was dissociated in September, 2006, the month in which the trial court rendered its original judgment of dissociation. Only after the passage of time, and subsequent decline in the real estate market, did the defendants begin to claim that the date of dissociation should be a date other than the date of the trial court's decision. As stated by the Pennsylvania Supreme Court in a similar partnership context, "a party whose contention is rejected [on appeal] should gain nothing by the lapse of time . . . ." *Scheckter* v. *Rubin*, 349 Pa. 102, 104, 36 A.2d 315 (1944).

This conclusion is further supported by an examination of partnership law under the Uniform Partnership Act (UPA), the Revised Uniform Partnership Act (RUPA), and Connecticut's Uniform Partnership Act (CUPA).[3] My review of cases in other states where an automatic stay existed while the UPA was in effect indicates that the proper date of dissolution is the date of the trial court's judgment of dissolution and not the date a subsequent appeal from that judgment is resolved. My review of cases in these other states further indicates that this rule of law did not change upon adoption of the RUPA.

The majority lists several policy reasons why its decision is sound in that "the plaintiff was not dissociated until the conclusion of his appeal in *Brennan I*." First, "a partner should not be allowed to participate in a partnership when he does not share in the risk that the partnership will lose value." Second, "an outgoing partner would be deprived of sharing in any value he added to the partnership through his good faith efforts to run the business during the pendency of his appeal . . . ." Third, "a disgruntled, outgoing partner could

take a nonmeritorious appeal for the sole purpose of intentionally sabotaging the business of the partnership, knowing that he is not risking a diminution of his interest." In response to the first policy reason, in my view, a dissociated partner *does* share in the risk that the partnership will lose value even if his partnership interest is valued before he ceases participation. The dissociated partner has an economic incentive to prevent the loss of value and foster profitability of the partnership so that he ultimately will be paid his full share. Moreover, the dissociated partner may properly be compensated for his work during that time by the trial court. While the majority's second policy reason is a valid reason, the opposite is also true in that a dissociated partner does not share in any decline in value. Regarding the third policy reason, a dissociated partner has a fiduciary duty while working for the partnership, even if he works postdissociation, which prevents him from intentionally sabotaging the business of the partnership. Further, any damage to the partnership may defeat the partnership's ability to pay him. Such a course of action would be self-defeating if the court ultimately reversed the decision dissociating that partner from the partnership.

In my view, there are additional contrary policy considerations which should be entertained. The majority permits the parties to continue to prolong this dispute. The *Brennan I* trial court, *Munro, J.*, ordered the plaintiff dissociated on September 27, 2006. The plaintiff appealed the ruling and this court affirmed the trial court's decision on August 18, 2009. See *Brennan* v. *Brennan Associates*, supra, 293 Conn. 60. The plaintiff subsequently filed the present action seeking, inter alia, valuation of his partnership interest pursuant to § 34-362 (b). On December 11, 2012, the trial court, *Shaban, J.*, rendered judgment in favor of the plaintiff and, on March 15, 2013, entered orders regarding the date of valuation, interest and attorney's fees. The defendants appealed and the plaintiff cross appealed. It is now 2015 and the case is not over. As a result of the majority's decision, the case will be sent back for a new trial regarding valuation and attorney's fees. There is certainly the potential that any trial court decision will then be appealed again due to both issues. The end result of this litigation is that, although the partnership interest will be valued as of 2009, the partner who was dissociated in 2006 may be able to extend this matter until 2016, the original ending date contained in the partnership agreement.

I also take issue with the majority's consideration of the defendants' claim as to the date of dissociation. The defendants should have presented this issue in *Brennan I* and never did. See id., 60. In my view, it is too late to discuss the matter at this time. *Brennan I* discussed the validity of the dissociation and certainly could have discussed the effective date of dissociation, but the

issue was never raised. In my view, the defendants' argument in this regard has been waived.

Unfortunately, the majority opinion does nothing to shorten the length of time taken in this matter or the delay occasioned by the parties. In my view, the procedure employed in these cases should be as follows: (1) the dissociation date should be the date the trial court rendered judgment of dissociation; (2) the dissociated party may then bring an appeal; cf. *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014) (discussing final judgment rule); (3) the trial court retains jurisdiction for valuation purposes; (4) the parties wait for the statutory 120 day period; see General Statutes § 34-362 (e); (5) the trial court then hears the valuation case; and (6) once a decision is received on the valuation, the judgment of valuation may then be joined with the original appeal. Either the Appellate Court or the Supreme Court would then hear a consolidated appeal. This process would save the parties at least three years involved in two separate appeals, thereby reducing the delay and the costs of attorney's fees incurred by the parties on two separate appeals.

Finally, as to part III of the majority opinion, I respectfully disagree with the majority's conclusion regarding attorney's fees because, in my view, the defendants did not offer any competent evidence during trial to sustain their claim that those fees should be treated as a liability of the partnership.

I would affirm the trial court's finding that the date of dissociation was September 27, 2006, and its conclusion that the attorney's fees were not a liability of the partnership. Accordingly, I respectfully dissent from parts I and III of the majority opinion.

The trial court's December 11, 2012 memorandum of decision appropriately sets forth the following relevant facts and procedural history. "On September 5, 1984, the plaintiff, along with Richard Aiello and [the] defendants Alexander Aiello and Serge Mihaly, entered into a written general partnership agreement . . . for the operation and management of certain real property known as the Trumbull Shopping Center . . . .

"After [the defendants] Salvatore [DiNardo], Peter [DiNardo], Leonard DiNardo and David Lehn became involved in [the partnership] as coadministrators of the estate of Richard Aiello,[4] issues arose among the partners regarding, among other things, who had check signing authority, who had control of and access to the books and records of the partnership, who should have contact with prospective and current tenants, and how decisions regarding leasing and improvements to the premises were to be made. Animosity quickly grew particularly between [the plaintiff] and the other partners. . . .

"As a result of the situation, the plaintiff commenced

a civil action against the defendants seeking a declaratory judgment as to the rights of the various parties under the partnership agreement. The defendants filed a counterclaim against the plaintiff seeking to have him statutorily dissociated from the partnership for his conduct. On September 27, 2006, a decision was rendered [by the trial court dissociating] the plaintiff from the partnership." (Footnote added.) "In [that] ruling, the [trial] court entered an order of dissociation pursuant to . . . § 34-355 (5) (C), which allows dissociation if it is found that 'the partner had engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner.' Such a finding constituted a wrongful dissociation which is defined by General Statutes § 34-356 (b) (2): 'In the case of a partnership for a definite term or particular undertaking, before the expiration of the term or the completion of the undertaking . . . (B) the partner is expelled by judicial determination under subdivision (5) of section 34-355.' "

"The dissociation did not, however, result in the dissolution or winding up of the partnership and it continued on in its business as allowed by statute. The plaintiff filed an appeal [and] the trial court's decision [was affirmed] on August 18, 2009. [See *Brennan* v. *Brennan Associates*, supra, 293 Conn. 60.] Because the parties were unclear as to the effect of the appellate stay on the plaintiff's involvement with the partnership, the plaintiff remained involved in its affairs during the pendency of the appeal. . . . He continued to, amongst other things, solicit tenants, attend partnership meetings, [and] write to the partners about the partnership's affairs . . . . He also continued to receive $48,640 per month constituting his percentage draw from the partnership consistent with the payments he had received prior to the dissociation. This participation and payment structure continued until the [plaintiff's appeal in *Brennan I* was resolved] at which time both his participation and the payments ceased. . . . The total payments received by the plaintiff from the . . . partnership between September 27, 2006 and August 18, 2009 were $1,702,400.

"Thereafter, by letter dated September 3, 2009, the plaintiff made demand upon the partnership pursuant to . . . § 34-362[5] for payment of his interest in the partnership. . . .

"By letter dated February 12, 2010, the partnership claimed that, based on a September 27, 2006 date of dissociation, the amount due to the plaintiff for his interest in the partnership was $3,272,340, with interest at the rate of [5 percent]. . . . This amount was calculated based upon the defendants' valuation of the plaintiff's partnership interest less payments made to him during the period of the appeal and for damages they claim were caused by him due to his wrongful conduct that led to the dissociation. The damages relative to

the claim of wrongful conduct were not itemized. No response was received by the defendants from the plaintiff relative to the February 12, 2010 letter until [the plaintiff filed the present action] on June 1, 2010." (Citations omitted; footnotes altered.) The plaintiff sought payment for the value of his partnership interest pursuant to § 34-362, as well as damages from the defendants resulting from mismanagement of the partnership affairs since the death of Richard Aiello. The defendants sought damages offsets pursuant to § 34-356 (c) for attorney's fees, as well as other damages resulting from the plaintiff's breach of fiduciary duty.

The trial court memorandum continued: "Prior to trial, the parties disagreed on what was the appropriate date of dissociation to be used by the court for the valuation of the plaintiff's interest in the partnership. The plaintiff contended that the appropriate date was the September 27, 2006 trial court decision. The defendants argued that the appropriate date was the August 18, 2009 ruling . . . affirming the trial court's decision. Because the application of the statute under these circumstances appeared to be an issue of first impression in this state, the court reserved judgment on the issue and took evidence and argument from the parties relative to both dates."

"The parties presented a significant volume of evidence relative to the valuation of the plaintiff's interest in the partnership. This included, but was not limited to, expert testimony as to the valuation of the real estate, leasehold interests, cash and other holdings of the partnership. [The] [p]laintiff's experts valued the plaintiff's [32 percent] interest in the partnership to be $9,400,000 as of September 27, 2006. [The] [d]efendants presented expert testimony establishing the value of the plaintiff's interest in the partnership as of that date to be $6,800,000." Ultimately, the trial court found the date of dissociation to be September 27, 2006, and valued the plaintiff's partnership interest at $8,640,000.

The trial court found, as a matter of law, that the partnership was for a definite term and, thus, that "the plaintiff was a partner who wrongfully dissociated under § 34-356 (b) (2) (B)."[6] The trial court accordingly applied § 34-362 (h) to determine whether the defendants could defer payment to the plaintiff until January 1, 2016, the end of the partnership term. See footnote 5 of this concurring and dissenting opinion. The trial court found "that having been aware of the dissociation order since September 27, 2006, and [that decision having been affirmed in 2009], the defendants easily could have begun to set aside funds over that period of time to ultimately make payment of any valuation of the plaintiff's interest in the partnership. Yet, there was no evidence that it did so. By failing to take any such steps, the court can infer that the defendants had little concern as to the sufficiency of the partnership's financial

resources to make payment of whatever was ultimately determined to be the amount due for the plaintiff's interest." The trial court found that "no undue hardship [would] befall the partnership to require payment before January 1, 2016, [and ordered that] the principal amount due shall be paid in accordance with the following schedule: $2,500,000 on March 1, 2013; $2,000,000 on January 1, 2014; $1,500,000 on January 1, 2015 and $937,600 on January 1, 2016. Nothing shall preclude the defendants from making additional payments or payment in full in advance of this schedule."

To account for the plaintiff's receipt of distributions and participation in partnership affairs during the pendency of the appeal, the trial court "allow[ed] a credit for the monthly payments made to the plaintiff from October 2006 through August 2009, totaling $1,702,400 . . . [finding that] [s]uch credit may be allowed given the unique circumstances of this case under the principles of equity. The plaintiff's continued participation in the affairs of the partnership due to the parties' perceived ambiguity of the effect of the dissociation ruling in light of the appeal and the fact the partnership had no obligation to provide the plaintiff with a monthly salary draw following the dissociation, justifies an equitable allowance of such credit." The trial court further concluded that "interest shall accrue from the date of dissociation to the date of payment pursuant to § 34-362 (b). In that the rate of interest is not specifically set forth in that statute, pursuant to [General Statutes] § 34-304 (b) the rate of interest shall be calculated at [8 percent] a year as set out in General Statutes § 37-1."

The defendants claimed offsets against the value of the plaintiff's partnership interest pursuant to §§ 34-356 (c) and 34-362 (c), (e), and (f) for costs associated with "all present and prior litigation between the parties [as] part of the damages caused by [the] plaintiff's wrongful dissociation . . . [which included] costs and attorney's fees relative to the partnership's involvement in the summary process actions it brought against its own tenants . . . [and] attorney's fees for the posttrial briefing in this matter." In calculating the total amount due, the trial court declined to award offsets for attorney's fees against the value of the plaintiff's partnership interest, finding "that the defendants [had] failed to establish by a preponderance of the evidence their special defenses that they [had] suffered any damages, in the form of attorney's fees or otherwise, as a result of the actions involving the tenants, the dissociation or the receivership action. There is insufficient evidence to establish that the damages claimed were causally related to the plaintiff's conduct."

After judgment, the plaintiff moved for offer of compromise interest and attorney's fees pursuant to General Statutes § 52-192a and Practice Book § 17-18, arguing that the 8 percent interest awarded from the date of

dissociation until the future date of payment caused the plaintiff's recovery to exceed the offer of compromise he had tendered to the defendants for $9,215,000. In its memorandum of decision dated March 15, 2013, the trial court ruled that, although the plaintiff's recovery exceeded the offer of compromise because of the interest awarded pursuant to § 34-362 (b), the cause of action giving rise to the plaintiff's recovery under § 34-362 was not an action for "money damages" or a "civil action based upon contract" under § 52-192a (a).[7]

The defendants appealed from the judgment of the trial court, claiming that the trial court improperly: (1) valued the plaintiff's partnership interest as of September 27, 2006; (2) awarded interest to the plaintiff from the date of dissociation to the date of payment; and (3) failed to include attorney's fees as a liability when it calculated the partnership value. The plaintiff cross appealed from the judgment of the trial court, claiming that the trial court improperly declined to award offer of compromise interest pursuant to § 52-192a (a).

The majority holds that the trial court improperly found that the date of dissociation, the date on which the plaintiff's partnership interest is valued pursuant to § 34-362 (b), was September 27, 2006, the date the *Brennan I* trial court rendered judgment of dissociation. Instead, the majority concludes that the date of dissociation is August 29, 2009, the date on which the parties could no longer file a motion seeking reconsideration of this court's opinion in *Brennan I*. Because the decline of the real estate market in 2008 negatively affected the profitability and value of the Trumbull Shopping Center, the defendants urge the 2009 date and, thus, the lower valuation of the plaintiff's partnership interest. The defendants claim that the trial court improperly construed § 34-362 (b) by ignoring the effect the date had on other provisions of the CUPA, particularly § 34-357 (b) (1).[8] Specifically, the defendants claim and the majority agrees that, because Practice Book § 61-11 (a)[9] stayed enforcement of the trial court's judgment of dissociation and, thus, prevented the plaintiff's de facto expulsion from the partnership between 2006 and 2009, the trial court should have concluded that the plaintiff's dissociation occurred on the later date. The defendants point to the fact that, between 2006 and 2009, the plaintiff received monthly partnership payments, participated in partnership affairs, and enjoyed the rights and privileges attendant to being a partner. Essentially, the defendants claim that the cause of the plaintiff's dissociation—"expulsion by judicial determination" pursuant to § 34-355 (5)—cannot occur until the dissociated partner experiences the effects of dissociation, namely, termination of management rights pursuant to § 34-357 (b) (1). The plaintiff responds that conduct occurring after the date of judgment of dissociation does not affect the fact that dissociation has occurred. I agree with the plaintiff.

As the trial court aptly noted, application of the statute under these circumstances is an issue of first impression in this state. This is due, in part, to the fact that the legislature substantially revised Connecticut's partnership laws in 1995. See footnote 3 of this concurring and dissenting opinion. Because of the paucity of case law interpreting the CUPA, I must first begin with case law in, and commentary about, the fundamental principles of partnership law inherent in the UPA. Jurisprudential understanding of the UPA caused and influenced the relevant revisions seen in the RUPA. In fact, in *Brennan I*, this court acknowledged the fact that the history of the UPA informed our interpretations of the RUPA, noting that "there is nothing in the history of, or policy underlying, these provisions to support the distinction [between the remedy of dissociation, a relatively new term in partnership law, versus that of dissolution] proposed by the plaintiff" especially in light of an official comment in the RUPA stating that " 'dissociation,' is used in lieu of . . . the term 'dissolution' . . . ." *Brennan* v. *Brennan Associates*, supra, 293 Conn. 84, quoting Rev. Unif. Partnership Act of 1997, § 601, comment (1), 6 U.L.A. (Pt. 1) 164 (2001). This court agreed with the trial court's use of "case law addressing the more established, and in [the trial court's] view analogous, standard for dissolution"; *Brennan* v. *Brennan Associates*, supra, 77; and noted the conceptual similarities between dissociation and dissolution. Id., 83–84.

The resolution of the defendants' claim in the present case requires me to interpret the phrase "date of dissociation" contained in § 34-362 (b), as well as other references to dissociation in the CUPA. The proper interpretation of the CUPA is a "question of law, 'over which [this court] exercise[s] plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . .' " *Brennan* v. *Brennan Associates*, supra, 293 Conn. 78–79. When construing a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . [W]e also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013); see also General Statutes § 1-2z. "[T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader

statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Brennan* v. *Brennan Associates*, supra, 90–91.

No court has squarely addressed a challenge to the date of dissociation, under the RUPA, based on the effect of an appellate stay. Additionally, no court has squarely addressed a challenge to the date of dissolution, under the UPA, based on the effect of an appellate stay. Accordingly, in the present case, three lines of inquiry inform my conclusion that the date of dissociation is the date of the trial court's decision in *Brennan I*: (1) case law interpreting the analogous provisions on partnership dissolution in the UPA and, specifically, disputes over the date of dissolution by decree of court; (2) problems with the dissolution provisions of the UPA that the drafters of the RUPA attempted to remedy, particularly confusion over the causes and effects of dissolution; and (3) the relation of the RUPA to, and its adoption of, the UPA principles of partnership dissolution in determining the appropriate date of dissociation, which comport with our appellate stay jurisprudence and policy rationales.

I

DATE OF DISSOCIATION

A

Because dissociation is a relatively new concept under partnership law, I begin, first, with a discussion of the causes of partnership dissolution under the UPA, which are analogous to the causes of dissociation under the RUPA. Thereafter, because no court has squarely addressed a challenge to the date of dissolution, under the UPA, based on the effect of an appellate stay, I discuss and glean principles from case law about the date of dissolution that I will later apply in interpreting the date of dissociation; specifically, that it is the conduct giving rise to the grounds for dissolution—the cause of the dissolution—that controls the date of dissolution, and not conduct occurring postdissolution.

Under the UPA, the term "dissociation" did not exist; instead of dissociation, if certain enumerated events occurred, such as death, bankruptcy of a partner, or expulsion of a partner, the underlying partnership would be dissolved.[10] Because some causes of dissolution were automatic and some required a decree of court, courts encountered some difficulty in delineating the exact moment in time a partnership dissolved under the UPA. "Nearly half of the causes of dissolution [under the UPA] require judicial action. That is, they are not causes of dissolution per se, but rather are *grounds* for dissolution by court decree." (Emphasis added.) A. Bromberg, "Partnership Dissolution—Causes, Consequences, and Cures," 43 Tex. L. Rev. 631, 639 (1965). For example, bankruptcy of a partner caused an immediate dissolution, with no judicial decree necessary to cause

the dissolution or judicially recognize that dissolution has occurred. See footnote 10 of this concurring and dissenting opinion. Other causes of dissolution under the UPA required a decree of court, such as when a partner was of "unsound mind . . . [a] partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business . . . [or] a partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him . . . ." Unif. Partnership Act of 1914, § 32, 6 U.L.A. (Pt. 2) 404 (2001). "Judicial action [would be] appropriate [in those cases] because [the judicial causes of dissolution] involve the determination of difficult [fact-intensive] matters (such as lunacy, persistent breach, or, in the last analysis, impossibility of performance) . . . ." J. Crane & A. Bromberg, Law of Partnership (1968) § 78, p. 436. Even though nonjudicial causes of dissolution under the UPA allowed automatic dissolution without decree of court (e.g., bankruptcy of a partner), "any dissolution [could] become judicial to the extent that a partner [sought] a court-supervised accounting, winding up, or receivership." (Footnotes omitted.) A. Bromberg, supra, 639.

"To determine the date of dissolution, it is necessary first to consider the cause of dissolution." *In re Crutcher*, 209 B.R. 347, 352 (Bankr. E.D. Pa. 1997). Determining this date often required a court to choose between nonjudicial and judicial causes of dissolution. See id. (choosing earliest of three possible dates of dissolution: [1] date partner had been expelled from business by being cut off from all management duties, judicial cause of dissolution under § 31 [1] [d] of UPA; [2] date partner filed for bankruptcy, nonjudicial cause of dissolution under § 31 [5] of UPA; or [3] date partner filed adversary proceeding in Bankruptcy Court for accounting, expressing his will to withdraw from partnership, nonjudicial cause of dissolution under § 31 [2] of UPA).[11]

"[Nonjudicial] causes [of dissolution] appear to operate ipso facto, and dissolution dates from the occurrence of the event." J. Crane & A. Bromberg, supra, § 78, p. 436. In *Robins* v. *Roland*, Docket No. B191659, 2008 WL 615865, *1 (Cal. App. April 7, 2008), for example, one partner of a three person real estate partnership died in 1994, leaving his wife as the executrix of his estate and the purported owner of his partnership interest. For years after her husband's death, the wife had received distributions from the partnership, attended company board meetings, signed minutes, and consented to partnership actions. Id., *6. After relations between the partners soured, the wife attempted to dissociate from the partnership nine years later. Pursuant to § 31 (d) (4) of the UPA, however, the death of the partner had already ipso facto caused dissolution

because the partnership agreement did not provide for continuation of the partnership upon a partner's death. Despite the wife's receipt of partnership distributions and participation in partnership affairs for years *after* the dissolution caused by her husband's death, the California Court of Appeal held that the partnership had dissolved as a matter of law upon the partner's death in 1994, thus rendering moot the wife's attempt to dissociate. Id., *3. The court reasoned that "[u]nder the UPA, a dissolved partnership does not automatically terminate but rather 'continues until the winding up of partnership affairs is completed.' . . . Thus, by default, the partnership would continue until being finally wound up and terminated. . . . [B]ecause the original overarching partnership dissolved upon [the partner's] death but has never been wound up, it continued to operate and to pay distributions to anyone entitled to receive them ('they got whatever they got before')." (Citations omitted.) Id., *4–5. The court in *Robins* properly determined that the effect of dissolution—ceasing to carry on business together—need not occur on the date of the cause of dissolution—death of a partner—because of the intermediate step of winding up. Similarly, another court noted that it did "not regard dissolution as immediately and necessarily moving the partnership into the stage of winding up, although winding up is certainly necessary before the partnership is ultimately terminated." *Anastos* v. *Stable*, 443 Mass. 146, 152, 819 N.E.2d 587 (2004); see *Estate of Webster* v. *Thomas*, Docket No. 5-12-0121, 2013 WL 164041, *3–4 (Ill. App. January 7, 2013) (affirming date of dissolution to be date of partner's death in 2002 even though partnership tax returns listed partner's estate as partner through 2006, partnership operated through 2007, and action for distribution not brought until 2008); see also *Lassen* v. *Ogren*, Superior Court, judicial district of New Britain, Docket No. CV-07-5004349-S (September 28, 2011) (*Swienton, J.*) (finding date of dissolution of joint venture to be date of partner's filing for bankruptcy, even though "the process of winding up the joint venture" was "stayed and delayed by the bankruptcy proceeding").

In contrast to nonjudicial causes of dissolution, judicial causes of dissolution have less clearly defined dates; it is more difficult to determine the exact moment in time a partnership dissolves where a trial court's decree of court establishes that dissolution has occurred. According to Alan Bromberg, a leading scholar on partnership law, "a judicial dissolution dates from the court decree, unless there is equitable reason for the court to set an *earlier* date. These rules fix the time when partners' rights and powers are modified, and when their rights to an accounting accrue." (Emphasis added; footnotes omitted.) J. Crane & A. Bromberg, supra, § 78, p. 436. In *In re Woskob*, 305 F.3d 177 (3d Cir. 2002), the United States Court of Appeals

for the Third Circuit chose between four possible dates of dissolution by decree of court: (1) the date the debtor's partner excluded the debtor from partnership proceeds in January 1997, a judicial cause of dissolution under the UPA; (2) the date the debtor excluded the debtor's partner from management and income from the partnership in April, 1997, a judicial cause of dissolution under the UPA; (3) the debtor's partner's bankruptcy in June 1997, a nonjudicial cause of dissolution under the UPA; or (4) the debtor's partner's death in 1999, a nonjudicial cause of dissolution under the UPA. With respect to whether the partners' expulsions in 1997 were "sufficient to dissolve [the] partnership through operation of law and without the need for a judicial decree," the Third Circuit distinguished between expulsions that "result in the instantaneous dissolution of the partnership"—such as when a partner expels another in accordance with power conferred by agreement under § 31 (1) (d) of the UPA—and those that "merely serve as grounds by which a court can decree a dissolution"— such as when a partner expels another *without* power conferred by agreement. Id., 183. The court held that because the partnership agreement did not confer the power to expel under § 31 (1) (d) of the UPA, and because neither of the parties had brought suit for dissolution by decree of court after their purported exclusions by each other, the exclusions had not operated to ipso facto dissolve the partnership and were "irrelevant to the partnership's date of dissolution." Id.; cf. *Roberts* v. *Mariner*, 195 Or. 311, 319, 245 P.2d 927 (1952) (choosing date of dissolution by decree of court as date Real Estate Commissioner cancelled partnership's real estate license in 1950, instead of date of partners' disagreement in 1949, or date of final decree of dissolution in 1951, because "both [partners], in effect, abandoned the partnership relation as of [the 1950] date . . . [and] [u]nder all the facts and circumstances of this case, it would be inequitable to fix a date later than . . . 1950, although ordinarily the date of the decree would be considered the date of final dissolution").

As in *In re Woskob*, supra, 305 F.3d 183, courts have looked to the conduct of the parties to determine when it would be equitable to set the date of dissolution at a time other than the date of the court's decree, finding this inquiry to be easier when conduct giving rise to grounds for dissolution is extreme, and harder where conduct giving rise to grounds for dissolution is not serious enough to "result in the instantaneous dissolution of the partnership." When conduct giving rise to grounds for dissolution by judicial decree is "serious and unequivocal . . . the misconduct really dissolves the partnership, the court decree merely giv[es] legal effect thereto." *Vangel* v. *Vangel*, 116 Cal. App. 2d 615, 626, 254 P.2d 919 (1953); see *Fisher* v. *Fisher*, 349 Mass. 675, 678, 212 N.E.2d 222 (1965) (fixing date of dissolution as date partner was notified in writing that he

was " 'permanently suspended' " from partnership, and effectively ousted, instead of date of judicial decree, and entering judgment nunc pro tunc, as of date he was notified, in interest of "[e]quity and . . . furtherance of justice"); see also *Edwards* v. *Edwards*, 122 Idaho 963, 968, 842 P.2d 299 (1992) ("[T]he effective date of a dissolution is the date of the *first effective act of dissolution; subsequent acts or causes of dissolution are irrelevant. . . .* Thus, although a dissolution by judicial decree generally dates from the date of the court decree, the date of dissolution may be deemed to have occurred *earlier*, where, as here, the partnership is dissolved on the *basis of findings that relate back to a prior date*." [Citations omitted; emphasis added.]); accord 68 C.J.S. 723, Partnership § 549 (2009).

But when grounds for dissolution by judicial decree are "so disputed or equivocal that automatic dissolution by operation of law, or self-help by partners [of excluding the offending partner] would be reckless"; J. Crane & A. Bromberg, supra, § 78, p. 437; the court may otherwise fix the date of dissolution as the date of the judicial decree. See *Graham* v. *Dietze*, Docket Nos. A-08-796 and A-09-088, 2010 WL 1600562, *5–6 (Neb. App. 2010) (finding impropriety in trial court's setting date of dissolution as date before suit brought, when most reliable financial information had been available, and holding that date was improper because parties' conduct had not ipso facto amounted to dissolution and parties had not sought judicial dissolution as of that date); cf. *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 626 (The trial court fixed the date of dissolution as the date of closing of evidence at trial instead of the date judgment was entered or the date of exclusion because "a court may, because of a breach of the partnership agreement, decree the dissolution of the partnership as of a date prior to the judgment. In some cases where the breach is serious and unequivocal the dissolution may be decreed as of the date of the breach. . . . But here the act of [the defendant] in excluding [the] plaintiffs did not ipso facto dissolve the partnership. His acts simply provided grounds for an application to a court of equity for such relief. . . . [The date of the close of evidence] was entirely reasonable since the whole story of the controversy was before the court as of that time." [Citation omitted.]).

The conduct of the parties has always been relevant to determining the date of dissolution by decree of court because the conduct itself provides the factual basis that gives rise to a cause of action for dissolution as a matter of law. In *Kruse* v. *Vollmar*, 83 Ohio App. 3d 378, 382, 614 N.E.2d 1136 (1992), the Court of Appeals of Ohio addressed whether a trial court had improperly failed to dissolve a partnership even though it had awarded punitive damages after finding that the defendants had excluded the plaintiff from management decisions. The Court of Appeals held that, on remand, the

trial court must dissolve the partnership and that "the cause of the dissolution must be determined in the first instance by the trial court . . . [and] the date on which the parties' interest in the partnership is to be finally ascertained is the date on which the trial court enters its judgment of dissolution consistent with this opinion . . . ." Id., 385. Upon motion for reconsideration, however, the Court of Appeals of Ohio, in a per curiam opinion, noted that, in holding that the date of dissolution must be the date of the trial court's judgment, it had "fail[ed] to fully consider that there may be events that could cause the trial court, in the first instance, to establish the date of dissolution *at a time previous to its final judgment entry*." (Emphasis added.) *Kruse* v. *Vollmar*, 85 Ohio App. 3d 198, 199, 619 N.E.2d 482 (1993). Accordingly, the court held that "the trial court should not be prevented from considering [events occurring prior to the date judgment is rendered] to ascertain what the proper date of dissolution should be . . . ." Id.

Though trial courts have properly found *earlier* dates of dissolution than the date the trial court renders judgment of dissolution based on the conduct or circumstances of the parties, trial courts have neither found nor attempted to find *later* dates of dissolution than the date the trial court renders judgment of dissolution. A trial court cannot find future facts and, thus, no appellate court has directly addressed whether an appeal of the judgment of dissolution would alter the "date of dissolution" to be *subsequent* to the date the trial court renders judgment of dissolution. In *Scheckter* v. *Rubin,* supra, 349 Pa. 104, however, the Supreme Court of Pennsylvania addressed whether the date of dissolution by decree of court should be the date specified in the decree nisi dissolving the partnership or the date when the trial court dismissed the exceptions to the decree nisi and entered the final decree. The appellant sought to gain the benefit of postdissolution appreciation in the value of his partnership interest from the date of the decree nisi to the date of the final decree. The court held unequivocally that the effective date of dissolution was the earlier date, "the date specified in the decree nisi which, in express words, dissolved the partnership as of that day. . . . There can be no serious objection, on the dismissal of the exceptions [to the decree nisi], to adopting, in the final decree, the date stated in the decree nisi as the dissolution date. In such circumstances, a party whose contention is rejected [on appeal] should gain nothing by the lapse of time between the dates of the nisi and final decrees." Id.; accord *Kirby* v. *Kalbacher*, 373 Pa. 103, 95 A.2d 535 (1953) (holding date of dissolution by decree of court to be date of decree nisi, notwithstanding affirmance of decree three months later, because affirmance merely restated fact of dissolution as of date on which it had been adjudged in decree nisi).

These decisions all establish the principle that the conduct giving rise to the grounds for dissolution—the cause of the dissolution—controls the date of dissolution. No events relating to the grounds for dissolution occur during the pendency of an appeal; conduct or circumstances of the parties relevant to dissolution have already occurred, the trial court has already found facts, and no further factual developments during that interim period can influence an appellate court as to the propriety of upholding a dissolution because such developments are not in the appellate record. A mere lapse of time after a trial court renders judgment of dissolution has no bearing on a trial court's a priori factual finding of dissolution as of a particular date.

Like the courts refusing to set the date of dissolution after, at the latest, the date the trial court renders judgment of dissolution, other courts have similarly refused to allow valuation of partnership assets after the date of dissolution because, under the UPA, the "value [of the departing partner's interest] is computed as of the date of dissolution rather than the later time of settlement, which means the outgoing interest is protected, as against the other partners, from [postdissolution] losses and does not get the benefit of [postdissolution] appreciation." (Footnotes omitted.) 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership (2014) § 7.13 (b) (1), pp. 7:186–7:187. For example, in *Oliker* v. *Gershunoff*, 195 Cal. App. 3d 1288, 1304, 241 Cal. Rptr. 415 (1987), the California Court of Appeal addressed whether an expelled partner of a real estate syndication partnership was entitled to a pro rata share of postdissolution appreciation in value of the partnership-owned realty. The real estate market during the *Oliker* partnership was in the middle of a recession when the withdrawing partner withdrew. Id., 1300. After the partners mutually agreed to allow the withdrawing partner to withdraw, an inflationary cycle began and real property values boomed. Id. The California Court of Appeal held that, in receiving the value of his interest in the partnership, the withdrawing partner could not take advantage of postdissolution appreciation of the partnership property because "[t]o reach a contrary result would be manifestly inequitable. [The withdrawing partner] had no downside risk [after dissolution] because his interest, in large part, was fixed as of the date of dissolution. By a parity of reasoning, the withdrawing partner should not be entitled to share in the upside potential. Otherwise, a withdrawing partner would have no motivation to settle his partnership accounts but instead could delay such matter, gambling on the chance that the partnership's assets would rise in value in the interim, and knowing that, in any event, his value in the interest in the partnership determined as of the date of dissolution could not be reduced by any subsequent events." Id., 1304.

Similarly, in *King* v. *Evans*, 791 S.W.2d 531, 535 (Tex. App. 1990), the Court of Appeals of Texas discussed how the UPA treated postdissolution fluctuations in value: "Section 42 [of the UPA] is intended to give the [noncontinuing] partner the benefit of asset appreciation at dissolution, and leave him unaffected by later [postdissolution] losses. . . . [T]he statute was obviously intended to put the risk of operating the business after dissolution on the continuing partner. This is the reason that the value of an outgoing partner's interest *must be computed as of the date of dissolution rather than the later time of settlement*. Conversely, neither would an outgoing partner receive the benefit of post-dissolution appreciation, should such occur." (Citation omitted; emphasis added.) The court in *King* noted that the "risks of continuation of the farming business after dissolution, including the risks of land depreciation in a falling real estate market, have been placed by statute on [the] continuing partner." Id., 536; see also A. Bromberg, supra, 43 Tex. L. Rev. 651 n.128 ("[v]aluation is as of the date of dissolution"), citing *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 615.[12]

Courts refusing to alter either the date of dissolution or the value of a partnership interest despite postdissolution fluctuations in value are justified in this refusal, notwithstanding that a departing partner had only *later* felt the effects of dissolution (i.e., had received partnership distributions or participated in partnership affairs during an interim period). After all, courts valuing a departing partner's interest can equitably adjust the valuation to account for postdissolution distributions received while winding up or maintaining the status quo. See, e.g., *Robins* v. *Roland*, supra, 2008 WL 615865, *3 (finding date of dissolution to be date of death of partner, even though partner's wife continued to manage partnership affairs and receive distributions for years after dissolution); *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 630 (affirming date of dissolution as date of closing of evidence in trial court, even though "it appear[s] from the briefs and from the oral argument that the status quo with respect to the partnership operations has remained unaltered during the pendency of this appeal"); *Scheckter* v. *Rubin*, 355 Pa. 633, 635–36, 50 A.2d 668 (1947) (ordering reimbursement of funds expended by former partner in maintaining partnership business postdissolution and during pendency of appeals because even former partners may be "justly and properly entitled to reimbursement out of the [partnership] assets" in continuing dissolved business until settlement and because such expenditures can "be accounted for accordingly").[13] Noteworthy in these and almost all appellate decisions about the date of dissolution is the absence of arguments that the date of an appellate decision has any relation—other than the mere passage of time—to the date a trial court a priori renders judgment of dissolution.

In accordance with the foregoing case law and principles of partnership law under the UPA, the date of dissolution and, thus, the date of valuation of a partnership interest is the date the trial court renders judgment of dissolution, or a date *prior* to that if the parties' conduct as found by the trial court—the cause of the dissolution itself—compels an earlier finding. Scholarship reinforces the principle that the date of dissolution is the date the trial court renders judgment of dissolution, or some date *prior* to when the trial court renders judgment of dissolution. See, e.g., J. Crane & A. Bromberg, supra, § 78, p. 436 and n.31; 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership, supra, pp. 7:98–7:99; R. Hillman, "Misconduct as a Basis for Excluding or Expelling a Partner: Effecting Commercial Divorce and Securing Custody of the Business," 78 Nw. U. L. Rev. 527, 544 n.63 (1983). Any date *after* the date the trial court renders judgment of dissolution has no factual relevance to the findings a trial court must make in determining a priori whether dissolution is warranted as a matter of law.

B

Having discussed case law interpreting the date of dissolution under the UPA, I now address other common problems courts and commentators have encountered in interpreting its dissolution provisions. In particular, I discuss problems with the definition of dissolution and how the statutory language set forth in the UPA created confusion about the causes and effects of dissolution. These problems informed the choices made by the drafters of the RUPA in overhauling the UPA and creating the analogue to dissolution—dissociation—that we must interpret in the present case.

Lawyers often misunderstood the term "dissolution" in the UPA. "Dissolution is probably the most confusing concept and area in all of partnership law." D. Weidner, "A Perspective to Reconsider Partnership Law," 16 Fla. St. U. L. Rev. 1, 13 (1988). "The dissolution of a partnership is but a preparatory step to its termination; a partnership continues after dissolution until the winding up of its affairs is completed." *Bass* v. *Dalton*, 218 Neb. 379, 381, 355 N.W.2d 225 (1984). Prior to the UPA, "the subject of the dissolution and winding up of a partnership [had been] involved in considerable confusion principally because of the various ways in which the word 'dissolution' [was] employed. The term sometimes designate[d] the completion of the winding up of partnership affairs. This, the end of the association, [instead] should be called the termination of the partnership." W. Lewis, "The Uniform Partnership Act," 24 Yale L.J. 617, 626–27 (1915). Some confused dissolution as the effect of some prior triggering event that caused the partnership to eventually terminate. The correct interpretation, however, was that the triggering event itself was the dissolution, after which a partnership would

wind up and terminate.

The UPA attempted to implement a precise definition of "dissolution"—accompanied by distinct references to winding up and termination—to clarify that dissolution did not mean termination. To remedy the misunderstanding, the UPA defined dissolution as " 'the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on [of the partnership's business] as distinguished from the winding up of the business.' . . . [D]issolution is distinguished from winding up and termination: 'On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed.' The [o]fficial [c]omment [to the UPA] explains that 'dissolution designates the point in time when the partners cease to carry on the business together; termination is the point in time when all the partnership affairs are wound up; [and] winding up . . . [is] the process of settling partnership affairs [that occurs] after dissolution.' " (Footnotes omitted.) D. Weidner, "A Perspective to Reconsider Partnership Law," supra, 16 Fla. St. U. L. Rev. 14.

Even after the UPA attempted to clarify dissolution, case law in the seventy-five years since the drafting of the UPA did not evince this clarity. "Despite the relative precision of the statutory language [of the UPA], ['dissolution,' 'winding up,' and 'termination'] continue to be used indiscriminately by many courts and lawyers." J. Crane & A. Bromberg, supra, § 73, p. 416.[14] The National Conference of Commissioners on Uniform State Laws revisited principles of partnership dissolution in 1986, deciding to undertake a complete revision of the UPA and recommending sixty-six changes to the partnership break-up provisions of the UPA. See UPA Revision Subcommittee of the Committee on Partnerships and Unincorporated Business Organizations, "Should the Uniform Partnership Act Be Revised?," 43 Bus. Law. 121, 121–25 (1987). Despite the passage of the UPA seventy-five years prior, "the law of partnership breakups still is confused. . . . [T]here are cases that appear to reflect a complete misunderstanding of the concept of dissolution as it is used in the UPA." (Footnotes omitted.) D. Weidner & J. Larson, "The Revised Uniform Partnership Act: The Reporters' Overview," 49 Bus. Law. 1, 4 (1993).

The revision subcommittee specifically noted that the leading scholar on partnership law "has criticized the lack of coordination between the general definition of dissolution under [§] 29 [of the UPA] and the specific causes of dissolution under [§§] 31 and 32 [of the UPA]." UPA Revision Subcommittee of the Committee on Partnerships and Unincorporated Business Organizations, supra, 43 Bus. Law. 161. The revision subcommittee agreed that the definition of dissolution "confuses the causes and effects in that [for example] a partner

expressing his will to dissolve is dissociating himself and causing a dissolution, but the dissociation results from the dissolution when it is caused by judicial decree . . . ." Id.; see also J. Crane & A. Bromberg, supra, §73, p. 417 and n.5; accord A. Bromberg, supra, 43 Tex. L. Rev. 646 ("[T]he general definition [of dissolution] confuses cause and effect. Despite the good offices of the act, many judges and lawyers continue to use dissolution and termination more or less interchangeably." [Footnote omitted.]). The revision subcommittee also recommended changes to terminology used to describe the effect of dissolution to "state affirmatively that after dissolution the authority of each partner . . . continues so far as may be necessary to wind up partnership affairs and to complete transactions begun but unfinished at dissolution . . . . The suggested change would give a statutory basis for certain actions of the partners sanctioned through a broad definition of 'winding up' as reflected in certain cases." UPA Revision Subcommittee of the Committee on Partnerships and Unincorporated Business Organizations, supra, 167–68; see *Lange* v. *Bartlett*, 121 Wis. 2d 599, 605, 360 N.W.2d 702 (App. 1984) (remanding to trial court for "testimony as to whether a wind-up or a continuation occurred" in order to determine proper valuation of withdrawing partner's interest in partnership); see also *Robins* v. *Roland*, supra, 2008 WL 615865, *3 (finding that years of wife's continued participation in partnership affairs and receipt of distributions postdissolution to be extended postdissolution, prewinding up period); see also footnote 14 of this concurring and dissenting opinion. Mid-revision, however, the cause and effect terminology problem had no ready solution: scholarly comments regarding one draft of the RUPA, in proposing language that "cessation of a partner's status does not cause a dissolution and winding up," noted that "it is misleading to say that [expelled partners'] status as partners has 'ceased.' . . . It may take time to 'close the books' on a partner, whether she is paid the value of her interest through a business liquidation or a buyout." D. Weidner, "Three Policy Decisions Animate Revision of Uniform Partnership Act," 46 Bus. Law. 427, 447 (1991).

Thus came the RUPA, which added the term "dissociation" to the statutory scheme in an attempt to clarify the moment in time when a partner begins the process of leaving a continuing partnership. See Rev. Unif. Partnership Act of 1997, § 601, supra, 6 U.L.A. (Pt. 1) 163; see also General Statutes § 34-355. "Although the term *dissociation* is new to the statute, the concept is not."[15] (Emphasis in original.) D. Weidner & J. Larson, supra, 49 Bus. Law. 7. The statutory scheme set forth in the RUPA employs the term dissociation "in lieu of the UPA term 'dissolution' to denote the change in the relationship caused by a partner's ceasing to be associated in the carrying on of the business . . . . [because] the

dissociation of a partner does not necessarily cause a dissolution and winding up of the business of the partnership." Rev. Unif. Partnership Act of 1997, § 601, comment (1), supra, 6 U.L.A. (Pt. 1) 164. " '[D]issociation' " is characterized as "the beginning of the end of association. A partnership, like a marriage, often is far easier to start than it is to end. . . . The process of dissociation is more complicated than in the case of [a shareholder selling shares in a public corporation] because every partner has agency power and personal liability that must be wound down. Whether there is a buyout of the dissociating partner or a liquidation of the partnership, the disengagement almost invariably takes time. [The] RUPA's list of the events that cause dissociation answers the policy question of whether enough has happened to trigger the contraction of a partner's association with the business." D. Weidner & J. Larson, supra, 7. "[The] RUPA rejects . . . [the concept that dissociation is] a single moment when one 'ceases' to be a partner—disengagement from the partnership relationship is a process that takes time to accomplish." Id. As with dissolution, "the consequences of the partner's dissociation do not occur at the same time. Thus, it is more useful to think of a dissociated partner as a partner for some purposes, but as a former partner for others." Rev. Unif. Partnership Act of 1997 § 601, comment (1), supra, 6 U.L.A. (Pt. 1) 164. Thus, dissociation of a partner causes "a 'mini-windup,' " because, simply stated, "a partner cannot walk away from an interest in a partnership as easily as can a shareholder from a share of stock." D. Weidner, "Three Policy Decisions Animate Revision of Uniform Partnership Act," supra, 46 Bus. Law. 447.

A review of the RUPA's structure, language, and official comments confirms that the concepts of dissociation and dissolution are analogous. We agreed with this premise in *Brennan I*, noting that the drafters of the RUPA used the term dissociation "in lieu of the 'UPA term "dissolution" . . . .' " *Brennan* v. *Brennan Associates*, supra, 293 Conn. 84. Just as § 31 of the UPA set forth "Causes of Dissolution" and § 32 of the UPA elaborated more fully on "Dissolution by Decree of Court," § 601 of the RUPA sets forth "Events Causing Partner's Dissociation," which include "expulsion by judicial determination" in § 601 (5) of the RUPA, as is relevant to the present case. See Rev. Unif. Partnership Act of 1997, § 601, comment (6), supra, 6 U.L.A. (Pt. 1) 166 ("[t]he enumerated grounds for judicial expulsion are based on . . . grounds for judicial dissolution" set forth in § 32 [1] of the UPA). "When the facts justify *either* the judicial expulsion of a partner *or* the issuance of a decree of dissolution of the partnership, the court at its discretion may pursue either option." (Emphasis added.) R. Hillman et al., Revised Uniform Partnership Act (West Ed. 2014–2015) § 801, author's comment (4) (e); see also A. Wensinger, "The Revised Uniform Part-

nership Act Breakup Provisions: Stability or Headache?," 50 Wash. & Lee L. Rev. 905, 934 (1993) ("The meaning of the RUPA's 'dissociation' is analogous to the . . . definition of dissolution [under the UPA]. . . . Although the RUPA has declined to define the term 'dissociation,' the RUPA's dissociation now has virtually the same meaning as the UPA's dissolution: the occurrence of some event altering a partner's willingness or ability to continue in the business. The effect of the RUPA's 'dissociation' is also similar to the effect of dissolution under the UPA. Like the UPA's 'dissolution,' dissociation under the RUPA does not indicate the termination of the partnership business. Dissociation indicates either that the partners continuing the partnership will purchase the departing partner's interest or that the partnership will terminate and [have] its assets liquidated." [Footnotes omitted.]).

C

With this understanding of (1) how courts have interpreted the UPA in determining the date of dissolution, (2) how the definition of dissolution confused cause and effect and how the drafters of the RUPA acknowledged this confusion, and (3) that "dissociation" was meant to supplant dissolution, I now turn to case law interpreting the date of dissociation under the RUPA.

No court has squarely addressed a challenge to the date of dissociation under the RUPA based on the effect of an appellate stay. Nevertheless, case law interpreting the RUPA indicates that the same principles that guided courts in determining the date of dissolution under the UPA—that the conduct or circumstances giving rise to the grounds for dissolution controls the date of dissolution—persevere in determining the date of dissociation under the RUPA. That dissociation is analogous to dissolution—as this court previously determined in *Brennan* v. *Brennan Associates*, supra, 293 Conn. 83–84—compels this court to again look to dissolution case law for guidance in determining the date of dissociation by judicial determination under the RUPA. The official comments to the RUPA explain that "[t]he phrase 'judicial determination' is intended to include an arbitration award, as well as any final court order or decree"; Rev. Unif. Partnership Act of 1997, § 601, comment (6), supra, 6 U.L.A. (Pt. 1) 166; concisely reaffirming prior, well established case law interpreting "dissolution by decree of court" under the UPA. See also R. Hillman et al., supra, § 601, author's comment (6) (e) ("Because judicial expulsion is a *response to prior conduct or circumstances* affecting a partner, an issue may arise concerning the effective date of the dissociation of an expelled partner. *Nothing in* [*the RUPA*] *reveals an intent to change prior case law, which suggests flexibility to fix a date of separation to suit the circumstances of a given case. Accordingly, the effective date of dissociation by judicial expulsion may be the date*

*of conduct or circumstances giving rise to the decree, the date of the petition for judicial relief, or the date of the decree itself. Normally, however, the date of the decree should mark the date of dissociation.*" [Emphasis added; footnote omitted.]). "The only significant difference between the approaches of [the UPA and the RUPA] is that, under [the] RUPA, a partnership does not necessarily 'dissolve' as a result of a partner's dissociation." L. Ribstein, "The Revised Uniform Partnership Act: Not Ready for Prime Time," 49 Bus. Law. 45, 62 (1993).

The determination that dissociation is analogous to dissolution also perseveres when I examine how the RUPA values an outgoing partner's partnership interest, whether the partnership continues despite dissociation or the partnership dissolves and liquidates. "The basic policy judgment is that the departing partner should get the same amount through the buyout that he or she would get if the business were wound up. Theoretically, the amount paid to the dissociating partner should be the same whether there is a buyout by the continuing partnership or a liquidation of the business." D. Weidner & J. Larson, supra, 49 Bus. Law. 11–12. Just as the conduct or circumstances of the parties informed the relevant date of dissolution under the UPA, the " 'moment of the event causing cessation' " informs the relevant date of dissociation in determining the price of a partner's interest during a buyout under the RUPA. D. Weidner, "The Revised Uniform Partnership Act Midstream: Major Policy Decisions," 21 U. Tol. L. Rev. 825, 840 (1990); see also *In re Woskob*, supra, 305 F.3d 177; *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 626; *Edwards* v. *Edwards*, supra, 122 Idaho 968; 68 C.J.S., supra, p. 723.

Case law interpreting dissociation under the RUPA follows the same logic, policy rationales, and reasoning inherent in partnership law as does case law interpreting dissolution under the UPA. Just like the court in *In re Woskob*, the court in *Fotouhi* v. *Mansdorf*, 427 B.R. 798, 803 (Bankr. N.D. Cal. 2010) also found, years after the fact, that a partner had been dissociated ipso facto upon his bankruptcy; accordingly, it valued the dissociated partner's partnership interest under the RUPA as of the date he filed for bankruptcy, even though the dissociated partner "chose to continue working at the firm even though he was technically dissociated, and should have been bought out." The court noted that "[t]he confounding factor is that even though [the dissociated partner] became a dissociated partner by operation of law, he continued conducting business, even though he no longer had the right to do so. The [Bankruptcy Court] correctly identified this problem—it characterized [the dissociated partner] as dissociated as a matter of law, but not as a matter of fact. The [partnership] did not treat [the dissociated partner] as dissociated, and it did not buy out his interest as required by [the RUPA]. As the record clearly

reflects, the court appropriately found that [the dissociated partner] became dissociated when he filed his bankruptcy petition. The court acknowledged that [the dissociated partner] was dissociated, but also found that the fact that he kept on working and being paid as if he were still a partner complicated matters. This recognition is not, as [a]ppellants would have us believe, a failure to treat him as dissociated. It is merely a recognition of the fact that he was dissociated in law, but still a de facto partner in fact." *Fotouhi* v. *Mansdorf*, supra, 802. Thus, like in *In re Woskob*, postdissociation participation in partnership affairs does not alter the fact of dissociation.

Courts interpreting the RUPA must also be guided by findings of fact with respect to the parties' conduct or circumstances that give rise to dissociation, just as courts interpreting the UPA have done so with respect to dissolution. Compare *Graham* v. *Dietze*, supra, 2010 WL 1600562, *5–6 (trial court improperly set date of dissolution as date before action brought because parties' conduct had not ipso facto amounted to dissolution and parties had not sought judicial dissolution as of that date), *Kruse* v. *Vollmar*, supra, 85 Ohio App. 3d 199 (trial court entitled to find earlier date of dissolution than date judgment is rendered if it makes factual findings that establish dissolution as matter of law at earlier date), with *Robertson* v. *Jacobs Cattle Co.*, 285 Neb. 859, 874–75, 830 N.W.2d 191 (2013) (Valuation of dissociated partner's share under RUPA as of "date of dissociation" clearly "refers to the date of the event which resulted in the dissociation" and because "the dissociation occurred as a result of expulsion by judicial determination . . . [the dissociated partners] were not dissociated from the partnership until the [D]istrict [C]ourt determined that they had engaged in conduct described in [§ 601 of the RUPA]").

Setting the "date of dissociation" as the date of the conduct or circumstances that *cause* dissociation remains correct notwithstanding postdissociation fluctuations in the value of the partnership. "During the period between dissociation and the purchase of the dissociated partner's interest, the dissociated partner is essentially a creditor of the partnership. The purchase price of the dissociated partner's interest is established as of the date of dissociation, it does not reflect post dissociation events in the life of the partnership." R. Hillman et al., supra, § 603, author's comment (6); see *King* v. *Evans*, supra, 791 S.W.2d 536 (UPA places "risks of continuation of the farming business after dissolution, including the risks of land depreciation in a falling real estate market [on the] continuing partner"); accord *Robertson* v. *Jacobs Cattle Co.*, supra, 285 Neb. 874–75 (The court refused to find the date of dissociation to be earlier than the date the trial court rendered judgment of dissociation by judicial determination even though "the appreciation of the land owned by the partnership,

[would make] using the earlier date to calculate the partnership's assets . . . result in [a] substantially lower buyout price" because "[c]learly the phrase 'date of dissociation' as used in [§ 701 of the RUPA] refers to the date of the event which resulted in the dissociation. The events which may result in dissociation are listed in [§ 601 of the RUPA]. Some of these, such as a partner's withdrawal or expulsion pursuant to the partnership agreement, occur without any judicial intervention. But in this case, the dissociation occurred as a result of expulsion by judicial determination . . . . [The] [a]ppellants were not dissociated from the partnership until the [D]istrict [C]ourt determined that they had engaged in conduct described in [§ 601 of the RUPA]." [Footnotes omitted.]).

### D

With these principles in mind, I now turn to the present case. The defendants claim, and the majority agrees, that the date of dissociation for purposes of valuing the plaintiff's partnership interest pursuant to § 34-362 (b) should be informed by § 34-357 instead of § 34-355.[16] They claim that the date of dissociation should follow this court's 2009 decision in *Brennan I* because only then did the plaintiff experience the effect of dissociation—termination of his "right to participate in the management and conduct of the partnership business . . . ." General Statutes § 34-357 (b) (1). By ending the appellate stay of the 2006 judgment of dissociation, this court's disposition of the parties' appeals "finally permitted the defendant partners to expel [the plaintiff] from the partnership." In light of the fact that the plaintiff received distributions and participated in partnership affairs until 2009, the defendants claim that "if the partner has not lost his right to participate in management of the partnership, he cannot be said to be dissociated from the partnership." I respectfully disagree.

I acknowledge that the effect of the appellate stay pursuant to Practice Book § 61-11 (a) and the subsequent participation of the plaintiff in partnership affairs "complicated matters," using the words of the court in *Fotouhi* v. *Mansdorf*, supra, 427 B.R. 802. Just as the dissociated partner in *Fotouhi* continued working postdissociation; id., 803; the plaintiff in the present case also continued working postdissociation. The plaintiff in the present case was dissociated as a matter of law, but not as a matter of fact, even though he had no technical right to participate in partnership management pursuant to § 34-357 (b) (1). Adopting the defendants' interpretation of "dissociation" as the date a partner *in fact* ceases to participate in the management and conduct of the partnership, instead of the date the trial court factually determines that the partner must be dissociated, either as of the date of the judgment of dissociation or at a prior date, however, would confuse cause and effect. See UPA Revision Subcommittee of

the Committee on Partnerships and Unincorporated Business Organizations, supra, 43 Bus. Law. 161 (noting that definition of dissolution, for which dissociation was later substituted, "confuses the causes and effects" of dissolution); see also J. Crane & A. Bromberg, supra, § 78, p. 417 and n.5. The true cause of the plaintiff's dissociation was the trial court's finding that an event causing the partner's dissociation had occurred, specifically, the trial court's finding that the plaintiff had "engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner . . . ." General Statutes § 34-355 (5) (C). The plaintiff's postdissociation conduct—participating in partnership affairs and receiving distributions despite technical dissociation—is not itself a cause of dissociation listed in § 34-355. See Rev. Unif. Partnership Act of 1997, § 601, comment (1), supra, 6 U.L.A. (Pt. 1) 164 ("[§] 601 enumerates *all* of the events that cause a partner's dissociation" [emphasis added]).[17] "[The] list of the events that cause dissociation [in the RUPA] answers the policy question of whether enough has happened to trigger the contraction of a partner's association with the business." D. Weidner & J. Larson, supra, 49 Bus. Law. 7. As of the date of the *Brennan I* trial court's decision, all of the conduct and circumstances relevant to the plaintiff's dissociation had already occurred: enough had happened to trigger the departure of the plaintiff from the partnership. No subsequent conduct could alter that fact, duly found by the trial court in *Brennan I*, nor could any subsequent conduct during the pendency of the appeal even be considered on appeal, as it would not have been part of the appellate record.[18]

In the present case, though the plaintiff felt the effect of dissociation—termination of management rights and receipt of distributions—in 2009, I agree with the trial court that the cause of dissociation—findings of fact establishing grounds for dissociation pursuant to § 34-355 (5) (C)—occurred in 2006 and, therefore, that the plaintiff was dissociated in 2006. It is well established that the effects "of the partner's dissociation do not all occur at the same time. Thus, it is more useful to think of a dissociated partner as a partner for some purposes, but as a former partner for others." Rev. Unif. Partnership Act of 1997, § 601, comment (1), supra, 6 U.L.A. (Pt. 1) 164; see D. Weidner, "Three Policy Decisions Animate Revision of Uniform Partnership Act," supra, 46 Bus. Law. 447 ("[I]t is misleading to say that [expelled partners'] status as partners has 'ceased.' . . . It may take time to 'close the books' on a partner, whether she is paid the value of her interest through a business liquidation or a buyout."). The RUPA recognizes the complication that a partner might not necessarily cease to participate in partnership affairs despite dissociation and, accordingly, "rejects . . . [the idea that dissociation is] a single moment when one 'ceases' to be a

partner—disengagement from the partnership relationship is a process that takes time to accomplish." (Footnote omitted.) D. Weidner & J. Larson, supra, 49 Bus. Law. 7; cf. footnote 14 of this concurring and dissenting opinion.[19]

Disengagement of the plaintiff from the partnership took time because both parties appealed the trial court's decision in *Brennan I* that dissociated the plaintiff. Though the appellate stay set forth in Practice Book § 61-11 (a) caused the parties to maintain the status quo of partnership distributions and management authority during the pendency of the appeal, the plaintiff had already been dissociated by the judgment of the trial court in *Brennan I*.[20] See Rev. Unif. Partnership Act of 1997, § 601, comment (1), supra, 6 U.L.A. (Pt. 1) 164 ("[T]he consequences of the partner's dissociation do not occur at the same time. Thus, it is more useful to think of a dissociated partner as a partner for some purposes, but as a former partner for others.").

The drafters of the RUPA explicitly stated that "dissociation" was meant to supplant "dissolution" and that "dissolution" now had a new meaning. Id. ("An entirely new concept, 'dissociation,' is used in lieu of the UPA term 'dissolution' . . . . 'Dissolution' is retained but with a different meaning.").

There can be no dispute that "dissolution" under the UPA, by virtue of its once confusing definition, had occupied two roles. See part I B of this concurring and dissenting opinion (discussing cause and effect); 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership, supra, p. 7:6. The first role was its role in defining the *cause* of the change in the partnership, i.e., death, bankruptcy, misconduct of a partner. The second role was its role in defining the *effects* of the change in the partnership, i.e., winding up and termination.

For dissolution's first role, defining the cause, the drafters of the RUPA decided to replace the word "dissolution" with the word "dissociation," "answer[ing] the policy question of whether enough has happened to trigger the contraction of a partner's association with the business." D. Weidner & J. Larson, supra, 49 Bus. Law. 7. If enough had happened—if dissociation had been caused—the partnership would thereafter choose between one of two paths. On the first path, after dissociation of a partner for misconduct, the business could continue and the dissociating partner could be bought out. On the second path, after dissociation of a partner for misconduct, the business could treat such partner's dissociation as a dissolution of the partnership and thereafter wind up and terminate. On both paths, at least in the context of a change in the partnership due to a partner's misconduct, there must first have been a dissociation of the partner.

For dissolution's second role, defining the effect of

a change in the partnership, i.e., winding up and termination, the drafters of the RUPA decided to retain the word "dissolution." Dissolution was, thus, repurposed to describe the second path, the result or effect of the dissociation that meant that the partnership would wind up and terminate. See Rev. Unif. Partnership Act of 1997, § 701, supra, 6 U.L.A. (Pt. 1) 175 ("[i]f a partner is dissociated from a partnership without *resulting in* a dissolution and winding up of the partnership business under [§] 801" [emphasis added]). This interpretation is corroborated by the commentary's description of dissociation as a " 'switching' provision" and its statement that "after a partner's dissociation, the partner's interest in the partnership must be purchased pursuant to the buyout rules in [§ 701] *unless there is a dissolution* and winding up of the partnership business under [§ 801]. Thus, a partner's dissociation for misconduct will always result in *either* a buyout of the dissociated partner's interest *or* a dissolution and winding up of the business." (Emphasis added.) Rev. Unif. Partnership Act of 1997, § 603, comment (1), supra, 6 U.L.A. (Pt. 1) 172. "Under [the] RUPA, not every partner dissociation causes a dissolution of the partnership. Only certain [dissociations] trigger a dissolution. The basic rule is that a partnership is dissolved, and its business must be wound up, only upon the occurrence of one the events listed in [§] 801. All other dissociations result in a buyout of the partner's interest under [§ 701] and a continuation of the partnership entity and business by the remaining partners." Rev. Unif. Partnership Act of 1997, § 801, comment (1), supra, 6 U.L.A. (Pt. 1) 190.

Automatic stays existed prior to the adoption of the RUPA and, despite their existence, the cases cited nevertheless yielded the same rule of law that the proper date of dissolution was the date of judgment of dissolution and *not* the date a subsequent appeal was resolved. See, e.g., *In re Woskob*, supra, 305 F.3d 177; *Fotouhi* v. *Mansdorf*, supra, 427 B.R. 802; *In re Crutcher*, supra, 209 B.R. 352; *Estate of Webster* v. *Thomas*, supra, 2013 WL 164041; *Anastos* v. *Stable*, supra, 443 Mass. 146; *Fisher* v. *Fisher*, supra, 349 Mass. 675.[21] Apart from the majority's claim that the stay changes the result, the majority has offered no law to that effect nor explained how this result would alter our jurisprudence regarding appellate stays in other cases.

My own review of our jurisprudence interpreting appellate stays indicates that the date of dissociation does not change even if a judgment of dissociation is stayed pending appeal. I begin by noting that the appropriate time to challenge the effect of the automatic stay on the plaintiff's participation in partnership affairs would have been during the appeal in *Brennan I*. Practice Book § 61-14 provides in relevant part that "[t]he sole remedy of any party desiring the court to review an order concerning a stay of execution shall be by motion for review under Section 66-6. . . ." Practice

Book § 66-6 provides in relevant part that "[t]he court may, on written motion for review stating the grounds for the relief sought, modify or vacate any order made by the trial court . . . concerning a stay of execution in a case on appeal . . . . Motions for review shall be filed within ten days from the issuance of notice of the order sought to be reviewed. . . ." Cf. *In re Melody L.*, 290 Conn. 131, 172–73, 962 A.2d 81 (2009) ("If the motion [for relief from stay] is denied, a [party] may seek to have that denial reviewed by filing a motion for review pursuant to Practice Book § 66-6, as the [parties] did in this case. Indeed, it appears that the [parties'] appeal from their motion for [relief from a stay] pending appeal is merely an attempt for further review of the same issues decided in the motion for review." [Footnote omitted.]).

If the defendants had truly questioned the effect of the appellate stay on the judgment of dissociation as it related to the plaintiff's continued participation in the partnership, they should have included this claim in *Brennan I*. The fact of the matter is that the defendants did not question the propriety of the stay in the appellate system until it had an economic incentive to do so, when real estate prices fell years later and when it realized that the date of dissociation could impact the valuation of the partnership under the RUPA. In fact, in 2006, the defendants acknowledged that the plaintiff would have management rights during the pendency of the appeal, that the defendants might have to pay interest during that time period; see footnote 13 of this concurring and dissenting opinion; and, yet, that "the [trial] court [had] granted the defendants' remedy of dissociation" as of September 2006. Notwithstanding these acknowledgments, the defendants asked the trial court to set a valuation hearing date within thirty days of its posttrial brief of issues to be resolved. We normally would decline to review the defendants' challenge to the effect of the appellate stay years after the fact and merely because real estate values did not go in the direction the defendants had hoped. Cf. *Sargent* v. *Smith*, 272 Conn. 722, 733, 865 A.2d 1129 (2005) (denying plaintiff's claim in second appeal that he would have been entitled to money collected by receiver during pendency of first appeal, and noting that "no equitable considerations warrant a contrary result" because same parties were involved in both actions, that plaintiff could have alerted trial court in first action to his claim, and that plaintiff could have taken appeal challenging actions of receiver when actions actually occurred).

I next note that the present case is not about the plaintiff's participation in partnership affairs: that was *Brennan I*. The present case is about the valuation of the plaintiff's partnership interest. Partnership law is not the only area of law in which a judgment effects a change in the parties' relationship *and* sets a date on which to value the parties' assets. In divorce actions,

for example, the judgment of divorce changes the relationship of the parties and sets the date on which to value the parties' assets. Although a party to a divorce may appeal the judgment of dissolution, the appeal of that judgment—that both judicially separates the parties and sets the date on which to value the marital assets—has no effect on the date of valuation of the marital assets. In *Sunbury* v. *Sunbury*, 216 Conn. 673, 676–77, 583 A.2d 636 (1990), this court concluded that property distributed by way of equitable distribution must be valued as of the date of dissolution of the marriage, *not* as of the date of remand after appeal of an aspect of the judgment of dissolution. This was true notwithstanding that the marital assets valued as of the date of dissolution, and in the sole possession of one party, had substantially appreciated during the pendency of the appeal. Id., 677. We noted that "it becomes important to fix the parties' circumstances at some point in time to serve as a bench mark" and that "[s]uch a construction of our dissolution statutes also comports with well recognized principles regarding the finality of actions. 'It is not in the public interest . . . to condone a procedure which would permit a plaintiff to litigate the same question over and over again, encumbering the mechanisms our society has established to resolve disputes . . . . Litigation must end at some point.' " Id., quoting *Corey* v. *Avco-Lycoming Division*, 163 Conn. 309, 321, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973). We also commented on a trial court's ability, or lack thereof, to do justice to the parties by piecemeal consideration of discrete aspects of the financial relationship between the parties, noting that attempting to do so *years after the fact* "could no more fashion just and equitable financial orders . . . than it could reassemble a broken vase with only one piece." (Internal quotation marks omitted.) *Sunbury* v. *Sunbruy*, supra, 216 Conn. 675, quoting *Sunbury* v. *Sunbury*, 210 Conn. 170, 173, 553 A.2d 612 (1989).

The parties' appeal in *Brennan I* did not challenge the notion that the parties should be prevented from working together; indeed, the plaintiff stated in his brief that he "has never disputed the fact that there was a great deal of dissension between [the] defendants and [the] plaintiff." Instead, *Brennan I* was merely about the appropriateness of the remedy: the plaintiff claimed that, instead of his being dissociated from the partnership, the partnership should have been dissolved, or that it should have been *the defendants'* being forced to withdraw from the partnership. Specifically, the plaintiff claimed in his brief that "[e]ven if [the] defendants' newly discovered attitude towards the plaintiff's twenty year old conduct were genuine, it is *their* change of attitude, *not* [the] plaintiff's conduct, that makes it reasonably impracticable to carry on the partnership. In that case, perhaps withdrawal of the objecting part-

ners, or dissolution of the partnership might be appropriate; but dissociation of [the] plaintiff is not." [Emphasis in original.] Like in *Sunbury*, the parties merely appealed an aspect of the judgment of dissociation; they never desired to prevent their separation. Now, after eight years and the benefit of hindsight, the defendants challenge the date on which to value the plaintiff's partnership interest on the basis of considerations that would have been more properly raised in *Brennan I*. I would not condone the defendants' attempts to strategically litigate an issue that they failed to raise at the proper time. The ultimate result of the majority's decision is that the party bringing the appeal can gauge market conditions while the appeal is pending. If the market goes up, thereby increasing the appellant's share, the appeal may be pursued. However, if the market shows signs of decreasing the appellant's share, the appellant may withdraw his appeal and argue for a valuation date as of the trial court's date of judgment. A party should not be allowed to manipulate the court system in this manner.

I also note that, to the extent a judgment of dissociation can be characterized as a form of injunctive relief and disregarding the fact that the defendants could have raised this claim in *Brennan I*, the automatic stay of Practice Book § 61-11 (a) would be inapplicable. For the dissociated partner, the judgment acts as a restraint on further conducting business as a partner. The question then becomes whether the injunctive relief inherent to a judgment of dissociation is subject to the automatic stay.

In *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 652–58, 646 A.2d 133 (1994), this court explored what types of injunctions are automatically stayed by Practice Book (1994) § 4046, the predecessor to and functional equivalent of Practice Book § 61-11. This court traced the history of the automatic stay provision, noting that, generally, prohibitory injunctions, which restrain a party from commission of an act, were not automatically stayed pending appeal, while mandatory injunctions, which command a party to perform an act, were. Id., 652–54. "The primary purpose of these rules was to preserve the status quo during the pendency of the appeal. . . . Under this view, therefore, in the case of [not automatically staying] a prohibitory injunction, the enjoined party was prevented from doing irreparable harm to the party that successfully sought the injunction; in the case of [automatically staying] a mandatory injunction, the enjoined party was not required to assume a burden until the equities had been conclusively established." (Citation omitted.) Id., 653.

Our case law interpreting prior versions of our rules of practice confirmed that stays of prohibitory injunctions, as well as those of mandatory injunctions, were not automatic on appeal. Id., 654. We concluded that

prohibitory injunctions were not automatically stayed and that "the enjoined party ought to be required to request the trial court to rule on a stay pending appeal, and that absent such a request, the injunction ought to be considered in effect. . . . [D]ifferent portions of the same injunction may be treated differently for some purposes . . . the fact that the same injunction may have both prohibitory and mandatory aspects counsels that both aspects be treated similarly for purposes of whether the injunction is automatically stayed pending appeal." (Citation omitted.) Id., 657–58. The continuing vitality of this rule, that prohibitory injunctions are not automatically stayed on appeal, was reaffirmed in *Sullivan* v. *McDonald*, 281 Conn. 122, 126 n.2, 913 A.2d 403 (2007); see also 43A C.J.S. 464, Injunctions § 397 (2004) ("[i]t is within the discretion of the court to stay the operation of the decree [granting an injunction] pending an appeal therefrom, until the hearing of the appeal on the merits, but taking an appeal does not of itself operate as a stay" [footnotes omitted]).

Pursuant to *Tomasso Bros., Inc.*, the injunctive aspect of the judgment of dissociation in the present case—enjoining, by prohibition, the plaintiff from continuing to be a partner—*was not automatically stayed pending appeal* notwithstanding the provisions of Practice Book § 61-11. Accordingly, because the prohibitory injunction restraining the plaintiff from acting as a partner was not stayed, all aspects of the dissociation became effective upon entry of the judgment of dissociation. Cf. *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 148, 496 A.2d 476 (1985) (affirming judgment of contempt for party's violation of injunction during pendency of appeal, notwithstanding that injunction was reversed at conclusion of such appeal, because "court orders must be obeyed; there is no privilege to disobey a court's order because the alleged contemnor believes that it is invalid"). Judgments have full vitality during the pendency of an appeal, even if the appeal results in reversal of the judgment. This is especially true if the case is not one " 'where the injunction was transparently invalid or had only a frivolous pretense to validity.' " Id., 147, quoting *Walker* v. *Birmingham*, 388 U.S. 307, 315, 87 S. Ct. 1824, 18 L. Ed. 2d 1210, reh. denied, 389 U.S. 894, 88 S. Ct. 12, 19 L. Ed. 2d 202 (1967).

In the present case, however, the parties assumed the applicability of an automatic stay under Practice Book § 61-11, which, in effect, reinstated the plaintiff as a partner, and then requested relief from the automatic stay, which would have again enjoined the plaintiff from being a partner. The trial court in *Brennan I* denied the defendants' request for relief from the automatic stay under Practice Book § 61-11. Arguably, if the parties treated the plaintiff as a partner during the pendency of the appeal in *Brennan I* because they believed the injunctive aspects of the judgment of dissociation had been stayed, this court should accordingly treat

the plaintiff as having been a partner during that time and set the date of dissociation as the date of resolution of the appeal in *Brennan I*. Whether the parties, or the trial court in *Brennan I*, considered the injunctive aspects of the judgment of dissociation to be stayed pending appeal is not controlling on this court, however, especially in light of their failure to seek review pursuant to Practice Book § 66-6 and their failure to even raise this argument. The trial court in the present case said it all when it aptly noted that "the parties were unclear as to the effect of the appellate stay on the plaintiff's involvement with the partnership [and so] the plaintiff remained involved in its affairs during the pendency of the appeal." We should not entertain the defendants' post hoc attempt to engineer the best financial scenario for its mandatory buyout of the plaintiff, years after the fact.

The majority's interpretation encourages appeals and detracts from this court's policy of conserving our scarce judicial resources. It allows for the possibility of either party's benefiting from postjudgment market conditions and, thus, creates incentives to lodge appeals and gamble on fluctuating market conditions where such incentives did not exist previously. See *Scheckter* v. *Rubin*, supra, 349 Pa. 104 ("a party whose contention is rejected [on appeal] should gain nothing by the lapse of time between the dates of the nisi and final decrees"). Additionally, the majority's interpretation precludes settlement because, after an appeal has been filed, the date of dissociation would change to an unknown future date and, therefore, the parties could not possibly negotiate or settle because any appraisals they had would be meaningless. The majority's interpretation runs contrary to this court's declaration that "it becomes important to fix the parties' circumstances at some point in time to serve as a bench mark" and that we encourage "well recognized principles regarding the finality of actions. It is not in the public interest . . . to condone a procedure which would permit a plaintiff to litigate the same question over and over again, encumbering the mechanisms our society has established to resolve disputes . . . . Litigation must end at some point." (Internal quotation marks omitted.) *Sunbury* v. *Sunbury*, supra, 216 Conn. 677.

To reach its interpretation of the date of dissociation, the majority places emphasis on the word "expulsion" in construing "expulsion by judicial determination . . . ." (Internal quotation marks omitted.) Specifically, the majority concludes that "[t]he language of § 34-355 (5) (C) . . . indicates that . . . dissociation under that provision occurs not merely upon a judicial determination that the partner has engaged in improper conduct . . . but, rather, upon the partner's 'expulsion by judicial determination' that such grounds exist." (Emphasis omitted.) The majority thus appears to require *two* judicial determinations: first, a judicial

determination that cause exists to expel the partner from the partnership and, second, a judicial determination that the dissociating partner ceased his or her participation in the partnership after having found cause to expel the partner in the first instance. Thus, the majority would require expulsion in and of itself as a basis of dissociation. However, the majority's requirement that a partner be *de facto* expelled from a partnership before he or she can be dissociated ignores the plain language of § 34-357, which provides for cessation of management rights *upon* dissociation, not as *forming the basis of* dissociation. In essence, the majority conflates cause and effect, which the drafters of the RUPA attempted to prevent. See part I B of this concurring and dissenting opinion; R. Hillman et al., supra, § 601, author's comment (6) (e) ("judicial expulsion is a response to *prior* conduct or circumstances affecting a partner" [emphasis added]).

In support of its emphasis on the word "expulsion," the majority states that "[§] 34-355 (7) (C) is particularly illuminating [in highlighting the importance of the term expulsion in § 34-355 (5)], given that dissociation under that subparagraph, like under § 34-355 (5), involves a judicial determination," and yet § 34-355 (7) (C) does not use the term "expulsion." The majority's reference to § 34-355 (7) (C) does not advance the case for "expulsion" being the operative term, however, because § 34-355 (7) discusses events of physical or mental incapacity, such as "[t]he partner's death" and "the appointment of a guardian or general conservator . . . ." The term "expulsion" used in subdivisions (3), (4), and (5) of § 34-355 clearly refers to some wrongful conduct on the part of the partner, while subdivision (7) refers to incapacity through no fault of the partner.

The case law discussed previously in this opinion interprets the date of dissolution under the UPA *with reference to the causation role dissolution had played*, not the effect role dissolution had played. The courts cited have uniformly held that the causation type dissolution was the relevant moment to define the date of dissolution. Therefore, it has been noted that, "[n]othing in [the RUPA] reveals an intent to change prior case law [of determining the date of dissolution], which suggests flexibility to fix a date of separation to suit the circumstances of a given case. Accordingly, the effective date of dissociation by judicial expulsion may be the date of conduct or circumstances giving rise to the decree, the date of the petition for judicial relief, or the date of the decree itself. Normally, however, the date of the decree should mark the date of dissociation." (Footnote omitted.) R. Hillman et al., supra, § 601, author's comment (6) (e).

I would conclude that the trial court appropriately valued the plaintiff's partnership interest as of 2006, the date of dissociation, rather than the date the plaintiff

ceased to participate in partnership affairs, despite postdissociation fluctuations in value.[22] Setting this date comports with principles of partnership law that set the "value [of the departing partner's interest] as of the date of dissolution rather than the later time of settlement, which means the outgoing interest is protected, as against the other partners, from post-dissolution losses and does not get the benefit of post-dissolution appreciation." (Footnotes omitted.) 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership, supra, pp. 7:186–7:187; see R. Hillman et al., supra, § 603, author's comment (6) ("During the period between dissociation and the purchase of the dissociated partner's interest, the dissociated partner is essentially a creditor of the partnership. The purchase price of the dissociated partner's interest is established as of the date of dissociation [and] *it does not reflect post dissociation events in the life of the partnership.*" [Emphasis added.]); see also *Oliker* v. *Gershunoff*, supra, 195 Cal. App. 3d 1304 ("[The withdrawing partner's interest] was fixed as of the date of dissolution. By a parity of reasoning, the withdrawing partner should not be entitled to share in the upside potential. Otherwise, a withdrawing partner would have no motivation to settle his partnership accounts but instead could delay such matter, gambling on the chance that the partnership's assets would rise in value in the interim, and knowing that, in any event, his value in the interest in the partnership determined as of the date of dissolution could not be reduced by any subsequent events.").

Additionally, the defendants' arguments to value the plaintiff's partnership interest as of 2009 belie the positions they took in *Brennan I*, in which they wished to value the plaintiff's partnership interest as early as possible and while the appeal was pending. See *Brennan* v. *Brennan Associates*, supra, 293 Conn. 64. After this court issued its opinion in *Brennan I*, the defendants sent an offer to purchase the plaintiff's interest in the partnership as of "the date of [the plaintiff's] dissociation (September 2006)."[23] Only after the passage of time, and subsequent decline in the real estate market, did the defendants begin to claim that the date of dissociation was a date other than the date of the trial court decision. See R. Hillman, "RUPA and Former Partners: Cutting the Gordian Knot with Continuing Partnership Entities," 58 Law & Contemp. Probs. 7, 16 (Spring 1995) ("[a]mbiguity concerning withdrawal may give the dissociating partner, or the continuing partners for that matter, an opportunity to define ex post the most advantageous date of withdrawal"); see also *Scheckter* v. *Rubin*, supra, 349 Pa. 104 ("a party whose contention is rejected [on appeal] should gain nothing by the lapse of time between the dates of the nisi and final decrees").

I would, accordingly, reject the majority's interpretation of the RUPA and, instead, reaffirm well established

principles of partnership law, holding the date of dissociation to be the date the trial court rendered judgment of dissociation, or a date *prior* to when the trial court renders judgment of dissociation, if the parties' conduct as found by the trial court—the cause of the dissociation itself—compels an earlier finding.

## II

### ATTORNEY'S FEES

As to part III of the majority's opinion, in my view, aside from some vague generalities, the defendants offered no proof that the partnership should have treated their attorney's fees as a liability of the partnership. Therefore, I respectfully dissent from the majority opinion regarding attorney's fees and would have affirmed the decision of the trial court.

The partnership never treated the attorney's fees as a liability of the partnership. All of the tax returns and evidence at trial support a contrary conclusion. Further, I disagree with the majority's characterization that the trial court decided the issue as a matter of law under § 34-356 (c) or § 34-362 (c). In my view, the trial court viewed the issue as one of causation in that the defendants had not proven attorney's fees should be treated as a liability.

The defendants claim that the trial court improperly failed to consider the defendants' attorney's fees as a liability of the partnership when computing the value of the plaintiff's partnership interest. They claim that the trial court improperly construed the partnership agreement[24] and that this construction constituted an error of law, over which this court exercises plenary review. See *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010). In opposition, the plaintiff claims that, at trial, the defendants couched their claim for attorney's fees as a claim for damages pursuant to §§ 34-356 (c) and 34-362 (c), not as a claim that the attorney's fees were a liability of the partnership. The plaintiff thus claims that this court should not disturb the trial court's finding that the attorney's fees, as damages, did not causally relate to the plaintiff's dissociation. I agree with the plaintiff.

Section 34-362 (b) provides a valuation formula for the purchase of a dissociated partner's partnership interest, as discussed previously in this opinion. Sections 34-356 (c) and 34-362 (c) also authorize offsets to the buyout price for any damages caused by a wrongfully dissociating partner—damages caused by "the wrongful nature of the dissociation." Rev. Unif. Partnership Act of 1997, § 602, comment (3), supra, 6 U.L.A. (Pt. 1) 170. Damages can include "substantial expenses resulting from a partner's premature withdrawal from a term partnership, such as replacing the partner's expertise or obtaining new financing. The wrongfully dissociating partner would be liable to the partnership

for those and all other expenses and damages that are *causally related to the wrongful dissociation*." (Emphasis added.) Rev. Unif. Partnership Act of 1997, § 602, comment (3), supra, 6 U.L.A. (Pt. 1) 171.

At trial in the present case, the defendants sought the entirety of their substantial attorney's fees as damages pursuant to §§ 34-356 (c) and 34-362 (c). The trial court noted that the defendants sought "costs and attorney's fees of all present and prior litigation between the parties [as] part of the damages caused by plaintiff's wrongful dissociation." The defendants' attorney's fees included fees incurred during *Brennan I* and the present case, as well as fees relating to the partnership's involvement in summary process actions it brought against some of its tenants. In support of their position on attorney's fees, the defendants cited exclusively to cases discussing the award of damages during partnership breakups.

Addressing the defendants' argument that it should award attorney's fees as damages, the trial court found that "the defendants have failed to prove by a preponderance of the evidence the allegations and applicability of their first and second special defenses. There is no evidence that the damages claimed by the defendants, whether for attorney's fees or otherwise, are causally related to the wrongful dissociation." In finding that "the conduct of the plaintiff did not lead to damage to the partnership but rather simply made management of the partnership unworkable" the court "decline[d] to award attorney's fees as an offset against the buyout price due the plaintiff."

On appeal, had the defendants challenged the trial court's determination that the attorney's fees did not causally relate to the plaintiff's wrongful dissociation, we would have reviewed the "trial court's determination of causation under the clearly erroneous standard." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 58, 717 A.2d 724 (1998).[25]

In the present case, however, the defendants do not challenge the legal or factual bases of the trial court's decision on causation. The defendants instead claim entitlement to attorney's fees based on an entirely different theory: they now claim that the attorney's fees should have been treated as a liability of the partnership pursuant to the partnership agreement. The plaintiff notes that, at trial, the defendants couched their claim for attorney's fees as a claim for damages under the RUPA. I agree with the plaintiff and would hold that, based on the defendants' theory of the case at trial, the trial court was entitled to treat the claim for attorney's fees as a claim for damages pursuant to §§ 34-356 (c) and 34-362 (c).

At trial, the defendants did not properly raise the claim that the attorney's fees were a liability of the

partnership; the overwhelming presentation of the claim was that the attorney's fees constituted damages. The defendants' counterclaim requested that the attorney's fees be awarded exclusively as damages for wrongful dissociation pursuant to §§ 34-356 (c) and 34-362 (c); they did not claim in the alternative that the attorney's fees were a liability of the partnership. Prior to sending their 2010 offer letter, the defendants engaged the partnership's accounting firm to provide balance sheets for the partnership over a period of years. These balance sheets did not list the attorney's fees as a liability.[26] The defendants' 2010 offer letter, prepared by the attorney for the estate of Richard Aiello, based its valuation of the plaintiff's partnership interest on the defendants' 2006 appraisal and balance sheets that had been prepared by the partnership's accountant; the letter treated the attorney's fees as damages, not as a liability.[27] At trial, the valuation experts of both the plaintiff and the defendants neither treated nor argued for treatment of the attorney's fees as a liability.[28] Neither party objected to the fact that both of their experts relied on partnership books and records, as well as partnership tax returns, all of which did not treat the attorney's fees as a liability.

The defendants did not offer the testimony of the partnership's accountant, who prepared the balance sheets or tax returns that both parties relied upon, to testify as to the accounting practices of the partnership. In lieu of the accountant's testimony, the parties instead stipulated to the amounts of the partnership's two liabilities for the two claimed dates of dissociation; those liabilities included only the amounts due on the mortgage and the tenants' security deposits owed, and did not include attorney's fees.[29] During his testimony, Lehn discussed why the partnership records *did not reflect the attorney's fees as a liability*.[30] Other portions of Lehn's testimony confirm that the parties never considered the attorney's fees to be a liability of the partnership and, indeed, that the parties would only have considered them to be so if and when the partnership failed to recover the fees as damages from the plaintiff.[31]

The defendants did suggest that the attorney's fees were a liability once in pretrial briefing[32] and once in posttrial briefing.[33] Notwithstanding these passing references to indemnification, the defendants cited exclusively to cases discussing the award of damages during partnership breakups. At most, the defendants' references to indemnification demonstrate, in their own words, a mere "*intent* that the legal fees incurred in this action be reimbursed by the partnership" only after "recovery of these fees from [the plaintiff] in the current matter." (Emphasis added.)

The defendants' theory at trial evinces a choice between two alternatives. On the one hand, the defendants could have chosen to book the attorney's fees

as a contingent liability of the partnership—contingent because the partnership, for want of cash, had not yet reimbursed the estate—thereby reducing the value of the plaintiff's partnership interest by the plaintiff's proportional share of all attorney's fees. See footnote 36 of this concurring and dissenting opinion. On the other hand, the defendants could have chosen to forgo booking the attorney's fees as a contingent liability in the hopes of recovering, as damages pursuant to §§ 34-356 (c) and 34-362 (c), the cash to pay off the estate in full; the partnership would "receive" the cash to pay off the estate by offsetting the entirety of the attorney's fees, as damages, against the value of the plaintiff's partnership interest. Put another way, if the trial court calculated the attorney's fees as a liability, those fees, possibly including attorney's fees incurred by the plaintiff,[34] would have been subtracted from the net assets of the partnership, and charged to the plaintiff in proportion to his partnership interest pursuant to § 34-362 (b), thus yielding a lower value of the plaintiff's partnership interest. If the trial court awarded the attorney's fees as damages pursuant to §§ 34-356 (c) and 34-362 (c), the defendants' attorney's fees would have been offset, below the line, against a higher value of the plaintiff's partnership interest. The defendants chose the latter theory. See footnote 30 of this concurring and dissenting opinion.

Scholars are familiar with the strategic choice involved in characterization of contingent liabilities during a valuation proceeding. See R. Hillman, "RUPA and Former Partners: Cutting the Gordian Knot with Continuing Partnership Entities," supra, 58 Law & Contemp. Probs. 22 ("[i]t is in the partnership's advantage to consider contingent liabilities in arriving at its estimate of the buyout price"); id., 22 n.93 ("[T]he partnership has an incentive to insist that all known liabilities be taken into account since they will reduce the buyout price. The dissociating partner might prefer to ignore contingent liabilities in favor of a higher buyout price and *take the chance of their ever materializing* [*or failing to materialize*]. The known liabilities rule, however, contemplates that all contingent or uncertain liabilities can and will be recognized in the valuation of the withdrawing partner's account, using estimates and probabilities. . . . [T]he partnership still has the incentive to use only the most favorable assumptions in arriving at its estimate of the value of the dissociated partner's interest." [Citation omitted; emphasis altered; internal quotation marks omitted.]).

In the present case, by choosing the damages theory of entitlement to attorney's fees, the partnership chose to ignore its contingent liabilities in favor of a higher buyout price, taking the chance that the trial court would: (1) find the plaintiff liable for damages representing the full amount of their attorney's fees; (2) offset the damages in full against the purchase price; and (3)

thus require the defendants to pay a much lower buyout price to the plaintiff. In doing so, the partnership also took the chance that the trial court would *not* find the plaintiff liable for the attorney's fees as damages, which occurred in the present case, causing the defendants to pay the higher buyout price and still owe the entirety of their own attorney's fees to the estate.

By choosing the damages claim of entitlement to attorney's fees, and presenting their arguments and evidence accordingly, the defendants failed to sufficiently raise their claim of entitlement to attorney's fees as a liability. See *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 631, 99 A.3d 1079 (2014) ("Even if we assume that [the defendant's] passing suggestion actually referenced [the claim raised on appeal], it was too little, too late, for several reasons. . . . [A]n issue must be 'distinctly raised' before the trial court, not just 'briefly suggested . . . .' "). The defendants pursued the theory on attorney's fees—damages pursuant to §§ 34-356 (c) and 34-362 (c)—that would have yielded the most favorable valuation had they been successful; the defendants would have recovered all reasonable litigation related expenses as an offset against the value of the plaintiff's partnership interest. That the defendants did not prevail on this theory is not reason enough to permit the defendants to pursue, for the first time on appeal, an entirely distinct and unpreserved theory, which they could have presented at trial with competent evidence. See id., 620–21 ("'[t]he requirement that claims be raised timely and distinctly also recognizes that counsel should not have the opportunity to surprise an opponent by interjecting a claim when opposing counsel is no longer in a position to present evidence against such a claim' ").[35]

The defendants' damages claim of entitlement to attorney's fees belies the overwhelming evidence they presented at trial, which confirms that the defendants chose what they believed at the time to be the most advantageous presentation of their claim.[36]

Absent an argument that the trial court's determination of causation had been improper, legally or factually, I would decline to disturb the trial court's adjudication of the defendants' claim of entitlement to attorney's fees. On the basis of the defendants' theory of the case at trial, the trial court was entitled to treat the claim for attorney's fees as a claim for damages pursuant to § 34-356 (c). See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 146, 84 A.3d 840 (2014) ("[i]n our adversary system . . . in the first instance and on appeal, we follow the principle of party presentation" [internal quotation marks omitted.]). The record is insufficient to review the defendants' claim that this court should characterize the attorney's fees as a liability. Accordingly, I would affirm the trial court's finding as to attorney's fees.

Therefore, I respectfully concur in part II of the majority opinion and dissent from parts I and III of the majority opinion.

[1] Alexander Aiello, Serge Mihaly, David Lehn, Peter DiNardo, Leonard DiNardo, and Salvatore K. DiNardo are also named as defendants in the present action. Aiello and Mihaly are partners in the partnership. Lehn, Peter DiNardo, Leonard DiNardo, and Salvatore K. DiNardo are coadministrators of the estate of a deceased partner, Richard Aiello. See *Brennan* v. *Brennan Associates*, 293 Conn. 60, 63 n.1, 977 A.2d 107 (2009). I refer to these defendants individually by name and, unless otherwise noted, references to the defendants throughout this opinion include both the individual defendants and the partnership.

[2] General Statutes § 34-355 provides in relevant part: "A partner is dissociated from a partnership upon the occurrence of any of the following events:

"(1) The partnership's having notice of the partner's express will to withdraw . . .

"(2) An event agreed to in the partnership agreement as causing the partner's dissociation;

"(3) The partner's expulsion pursuant to the partnership agreement;

"(4) The partner's expulsion by the unanimous vote of the other partners . . .

"(5) On application by the partnership or another partner, the partner's expulsion by judicial determination because: (A) The partner engaged in wrongful conduct that adversely and materially affected the partnership business; (B) the partner wilfully or persistently committed a material breach of the partnership agreement or of a duty . . . or (C) the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner;

"(6) The partner's: (A) Becoming a debtor in bankruptcy; (B) executing an assignment for the benefit of creditors; (C) seeking, consenting to or acquiescing in the appointment of a trustee. . . or (D) failing . . . to have vacated or stayed the appointment of a trustee . . .

"(7) In the case of a partner who is an individual: (A) The partner's death; (B) the appointment of a guardian or general conservator for the partner; or (C) a judicial determination that the partner has otherwise become incapable of performing the partner's duties under the partnership agreement;

"(8) In the case of a partner that is a trust . . . distribution of the trust's entire transferable interest in the partnership . . .

"(9) In the case of a partner that is an estate . . . distribution of the estate's entire transferable interest in the partnership . . . or

"(10) Termination of a partner who is not an individual, partnership, corporation, trust or estate."

[3] Connecticut originally enacted legislation based on the UPA in 1961. See Public Acts 1961, No. 158. This legislation was subsequently codified in General Statutes §§ 34-39 to 34-81. In 1995, our legislature repealed these provisions and enacted the CUPA, which mirrors the RUPA in all relevant respects. See Public Acts 1995, No. 95-341; see also General Statutes §§ 34-300 through 34-399.

[4] The partnership agreement specifically provided that "[u]pon death or incompetency of a partner, his or her estate or personal representative shall succeed to such partner's interest."

[5] General Statutes § 34-362 provides in relevant part: "(a) If a partner is dissociated from a partnership without resulting in a dissolution and winding up of the partnership business under section 34-372, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subsection (b) of this section.

"(b) The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subsection (b) of section 34-378 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.

"(c) Damages for wrongful dissociation under subsection (b) of section 34-356, and all other amounts owing, whether or not presently due, from the dissociated partner to the partnership, must be offset against the buyout price. Interest must be paid from the date the amount owed becomes due to the date of payment. . . .

"(e) If no agreement for the purchase of a dissociated partner's interest

is reached within one hundred twenty days after a written demand for payment, the partnership shall pay, or cause to be paid, in cash to the dissociated partner the amount the partnership estimates to be the buyout price and accrued interest, reduced by any offsets and accrued interest under subsection (c) of this section.

"(f) If a deferred payment is authorized under subsection (h) of this section, the partnership may tender a written offer to pay the amount it estimates to be the buyout price and accrued interest, reduced by any offsets under subsection (c) of this section, stating the time of payment, the amount and type of security for payment and the other terms and conditions of the obligation. . . .

"(h) A partner who wrongfully dissociates before the expiration of a definite term or the completion of a particular undertaking is not entitled to payment of any portion of the buyout price until expiration of the term or completion of the undertaking, unless the partner establishes to the satisfaction of the court that earlier payment will not cause undue hardship to the business of the partnership. A deferred payment must be adequately secured and bear interest.

"(i) A dissociated partner may maintain an action against the partnership . . . to determine the buyout price of that partner's interest, any offsets under subsection (c) of this section or other terms of the obligation to purchase. . . . The court shall determine the buyout price of the dissociated partner's interest, any offset due under subsection (c) of this section and accrued interest, and enter judgment for any additional payment or refund. If deferred payment is authorized under subsection (h) of this section, the court shall also determine the security for payment and other terms of the obligation to purchase. The court may assess reasonable attorney's fees and the fees and expenses of appraisers or other experts for a party to the action, in amounts the court finds equitable, against a party that the court finds acted arbitrarily, vexatiously or not in good faith. The finding may be based on the partnership's failure to tender payment or an offer to pay or to comply with subsection (g) of this section."

[6] General Statutes § 34-356 provides in relevant part: "(b) A partner's dissociation is wrongful only if . . .

"(2) In the case of a partnership for a definite term or particular undertaking, before the expiration of the term or completion of the undertaking . . . (B) the partner is expelled by judicial determination under subdivision (5) of section 34-355 . . . .

"(c) A partner who wrongfully dissociates is liable to the partnership and to the other partners for damages caused by the dissociation. The liability is in addition to any other obligation of the partner to the partnership or to the other partners."

[7] The plaintiff's second revised and amended complaint included causes of action for: (1) payment of the value of his partnership interest pursuant to § 34-362; (2) "damages resulting from mismanagement of the partnership affairs"; and (3) an accounting pursuant to General Statutes § 52-404 relating to overpayment of taxes in 2009 and 2010. The plaintiff recovered only under the first count, the second count was barred by the statute of limitations, and the third count was struck by the trial court. Accordingly, this appeal addresses only the first count of the plaintiff's second revised and amended complaint.

[8] General Statutes § 34-357 (b) provides in relevant part: "Upon a partner's dissociation:

"(1) The partner's right to participate in the management and conduct of the partnership business terminates . . . ."

[9] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

[10] Section 31 of the UPA provides in relevant part: "Dissolution is caused . . . [b]y the termination of the definite term or particular undertaking specified in the agreement . . . [b]y the express will of any partner . . . [b]y expulsion of any partner . . . [b]y any event which makes it unlawful for the business of the partnership to be carried on . . . [b]y the death of any partner . . . [b]y the bankruptcy of any partner or the partnership . . . [b]y decree of court under section 32." Unif. Partnership Act of 1914, § 31, 6 U.L.A. (Pt. 2) 370 (2001).

[11] Parties can, of course, stipulate to the date of dissolution or dissociation. See, e.g., *Rappaport* v. *Gelfand*, 197 Cal. App. 4th 1213, 1218, 129 Cal. Rptr. 3d 670 (2011).

[12] At least one court has permitted a postdissolution adjustment in property

value in order to comport with the equitable principles involved in settling partnership affairs during a complete liquidation of partnership assets, though it did so because the parties had not offered evidence about the property's value prior to that date. See *Flynn* v. *Haddad*, 25 Mass. App. 496, 502, 520 N.E.2d 169 (noting that "[g]enerally, the value of the partnership assets for the purposes of a final accounting and settlement is determined as of the date of dissolution, not the date of the final accounting" because application of that principle "presupposes reasonably contemporaneous distribution of the partnership assets," though allowing valuation of main partnership asset at later date during liquidation proceedings if better evidence is not offered as to value of asset to be liquidated, and finding that "the trial judge was not clearly wrong in adopting the motion judge's valuation, especially in view of the lack of any evidence by [the objecting partner] as to a different valuation"), review denied, 402 Mass. 1104, 524 N.E.2d 400 (1988).

[13] Section 42 of the UPA allowed a former partner of a continuing partnership to receive interest from the date of dissolution to the date of settlement. Section 42 also allowed the former partner to elect to receive profits attributable to the use of his interest in the partnership, in lieu of interest, from the date of dissolution until the date of settlement. This interest or profits election may have played a part in the parties' willingness to entertain appeals and not challenge the date of dissolution as being the date of an appellate decision. In fact, the purpose of the interest or profits election was to "hasten [on the part of the continuing partners] the settlement of the outgoing interest. The election also has been characterized as compensation for the breach of duty by the continuing partners in prolonging settlement." (Footnote omitted.) 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership, supra, p. 7:209. "[T]he election may operate unfairly when the delay in making settlement is caused by the [former partner] or is otherwise beyond the [continuing] partners' control." Id., p. 7:209 n.97. Without explanation, the RUPA eliminated the interest-or-profits election of a former partner. See Rev. Unif. Partnership Act of 1997, § 701, comment (3), supra, 6 U.L.A. (Pt. 1) 176.

[14] The differences between dissolution, winding up, and termination caused disputes about a former partner's ability to enter into postdissolution transactions for the purpose of winding up. After all, after dissolution, partners should have "ceased" to carry on business together pursuant to § 29 of the UPA even though the partners were tasked with winding up the business and settling affairs. This seeming impossibility—ceasing to carry on business together and yet entering into transactions to wind up partnership affairs—caused disputes as to the extent that partners of a dissolved partnership could enter into contracts, sell partnership property, receive payment of obligations due to the partnership, or litigate claims by and against the partnership. See J. Crane & A. Bromberg, supra, § 80, pp. 454–60. With respect to the authority of partners of dissolved, yet winding up partnerships, "[u]nless expressly enlarged [by agreement], actual authority to charge the firm property and create personal liabilities of co-partners is confined to acts appropriate for winding up, and does not extend to new business." (Footnotes omitted.) Id., p. 455. "In general, strictures on the partner's postdissolution authority yield to the necessity for winding up." Id., p. 457.

[15] While § 29 of the UPA explicitly defined "dissolution," the RUPA omitted the definition of "dissolution" and further did not explicitly define "dissociation."

[16] The parties did not cite case law interpreting the meaning of "expulsion by judicial determination" under § 601 (5) of the RUPA or dissolution by "decree of court" under §§ 31 (6) and 32 of the UPA.

[17] Unlike a case in which a partner's conduct was so serious or unequivocal that it ipso facto caused dissolution at the time of the conduct, the present case demonstrates conduct that, in the aggregate, merely provided *grounds* for dissociation on the date of the judgment. Put another way, the plaintiff's conduct provided a cause of action for dissociation by judicial determination, though the conduct was not so extreme or unequivocal such that the trial court in *Brennan I* equitably found dissociation at a date earlier than the date it rendered judgment of dissociation. Cf. *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 626 ("[T]he act of [the defendant] in excluding [the] plaintiffs did not ipso facto dissolve the partnership. His acts simply provided grounds for an application to a court of equity for such relief.").

Suppose the plaintiff had engaged in conduct that had ipso facto caused dissociation as a matter of law on the date of the conduct, such as giving the defendants notice of his express will to withdraw as a partner; General

Statutes § 34-355 (1); or filing for bankruptcy. General Statutes § 34-355 (6) (A). Under that scenario, a trial court's finding of dissociation on a date *prior to* the date it rendered judgment of dissociation would be meaningless if, by any party's lodging an appeal and maintaining the status quo, the date of dissociation would automatically move to the date of disposition of the appeal. Such an interpretation runs contrary to well established principles of partnership law allowing a trial judge to establish dissociation of a partner or dissolution of a partnership, and thus the date of valuation of a partnership interest, at the " 'moment of the event causing cessation.' " D. Weidner, "The Revised Uniform Partnership Act Midstream: Major Policy Decisions," supra, 21 U. Tol. L. Rev. 840; see *Robins* v. *Roland*, supra, 2008 WL 615865, *3; *Vangel* v. *Vangel*, supra, 116 Cal. App. 2d 630; *Estate of Webster* v. *Thomas*, supra, 2013 WL 164041, *4; *Anastos* v. *Stable*, supra, 443 Mass. 151–52; *Scheckter* v. *Rubin*, supra, 355 Pa. 634–35; see also *Lassen* v. *Ogren*, supra, Superior Court, Docket No. CV-07-5004349-S.

[18] The majority's interpretation of the date of dissociation as the date of disposition on appeal would necessitate subsequent trials to determine if any conduct of the parties during the pendency of the appeal might justify changing the date of dissociation. This: (1) frustrates the ability of the parties to negotiate and settle their affairs during the pendency of the appeal or even value the partnership as of a set date and, thus, avoid conducting multiple appraisals; and (2) runs contrary to the spirit of the RUPA in encouraging settlement.

The defendants themselves recognized this in their 2006 posttrial brief, noting that the purpose of § 34-362 (i) was to provide "a process by which the partners may exchange information about the valuation of the assets and liabilities and voluntarily resolve the valuation issue. This exchange of information has already occurred in this case. Not only have the parties examined the books and records of the company, they have each appraised the real estate and exchanged the appraisals with each other. Requiring additional time to pass before some other court takes up the issues will not add any information or result in a voluntary resolution. The parties simply disagree on the valuation issues and there is nothing left to do but have the [trial] court adjudicate these differences." Cf. *Lange* v. *Bartlett*, supra, 121 Wis. 2d 603 n.1 ("A policy of judicial administration is that lawsuits should come to an end sometime. Once the final accounting has been determined and a judgment is entered, it would be expensive and time consuming for parties and witnesses to come back into court to determine the amount of profit from the date of judgment until payment.").

Moreover, the majority's interpretation of the date of dissociation as the date of disposition on appeal raises more questions than it answers. If the parties withdrew their appeals, would the date of dissociation be the date(s) of those withdrawals? If the parties maintained the status quo, but later were granted relief from the appellate stay, as the parties in the present case attempted to do, would the date of dissociation be the date of the relief from stay? The events described in the previous two questions have no relation to the conduct or circumstances that trigger dissociation pursuant to § 34-355 and, indeed, are not listed as causes of dissociation within § 34-355. The exact date of dissociation would depend on factors—e.g., whether the parties' schedules permitted oral argument at an earlier date, whether the parties requested extensions of time for appellate briefing, the expediency that an appellate court rendered its decision, etc.—wholly unrelated to the factual findings upon which the trial court found cause, as a matter of law, for dissociation.

[19] Commentators agree that the statutory language leaves much to be desired. See A. Wensinger, supra, 50 Wash. & Lee L. Rev. 935–36 ("The potential for confusion created by the terminology of the RUPA breakup provisions seems astronomical given the similarity between [the] UPA 'dissolution' and the RUPA 'dissociation,' the . . . new definition of dissolution [under the RUPA], and the . . . substitution of dissolution with dissociation as the trigger for the breakup provisions [under the RUPA]. Further, the structure of the RUPA is awkward in its seemingly desperate continuation of the term 'dissolution,' and this is especially curious when one considers that a seeming consensus existed among the drafters that the term causes confusion."); 2 A. Bromberg & L. Ribstein, Bromberg and Ribstein on Partnership, supra, p. 7:98 ("[T]he dissolution occurs when the relevant 'judicial determination' is made. Because it is not clear whether the 'determination' is an initial order, a final resolution, or some other stage of the proceeding, [the RUPA] carries forward, if not exacerbates, the uncertainty concerning the time of dissolution . . . .").

[20] At oral argument in this court, the parties discussed a dissociated partner's diminished fiduciary duties after dissociation pursuant to § 34-357 (b) (2), which provides that the duty of loyalty to refrain from competing with the partnership ceases upon dissociation, and § 34-357 (b) (3), which provides that the duty of loyalty to account, the duty of loyalty to refrain from adverse interests, the duty of care to refrain from grossly negligent conduct continue for predissociation matters, but cease with respect to postdissociation matters, unless the partner participates in winding up. See A. Bromberg & L. Ribstein, Special Release on the Revised Uniform Partnership Act (1993), p. 85 ("[Section] 404 [of the RUPA] imposes fiduciary duties on any 'partner.' Section 603 (b) assumes that 'partner' does not apply to a dissociated partner. But nothing in [the] RUPA prevents courts from holding that a dissociated [yet participating] partner retains some partnership attributes, including fiduciary duties. That would be consistent with [the] RUPA's recognition of fiduciary duties in connection with 'winding up' and that a dissociated partner may participate in winding up. It is also supported by the UPA cases . . . holding that partners have fiduciary duties after dissociation. As a policy matter, the conditions that initially gave rise to the partners' fiduciary duties still exist as long as a former partner retains control over partnership property or management power." [Footnotes omitted.]); R. Hillman et al., supra, § 603, author's comment (4) ("Is the dissociated partner a partner or a former partner for purposes of the obligation of good faith and fair dealing? During the period between the act of dissociation and the purchase of the dissociated partner's interest . . . it is reasonable to require the dissociated partner to fulfill any remaining duties and exercise any remaining rights consistent with an obligation of good faith and fair dealing, [and therefore] the dissociated partner should be treated as a 'partner' for purposes of the obligation of good faith and fair dealing.").

The trial court found that the plaintiff had been dissociated despite his participation in partnership affairs during the appeal. Given the circumstances particular to the present case, the trial court might reasonably have been entitled to find that the plaintiff retained some fiduciary duties despite his technical dissociation. The trial court found that "the defendants have failed to establish by a preponderance of the evidence that for the period [during the appellate stay] the plaintiff was engaged in conduct that violated the duty of loyalty set forth in [General Statutes] § 34-338 (b) (1) or (2). Nor did he violate, to the extent it may be applicable to [the] defendants' claim, any duty of care under § 34-338 (c) to not engage in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law." The trial court also concluded that "[e]ven if one were to assume that there was a viable claim of breach of fiduciary duty [prior to lapse of the cause of action for breach of fiduciary duty in September 2008] based on the plaintiff's continued involvement with the partnership despite the dissociation ruling, the defendants have failed to meet their burden of proof under either the [CUPA] or the common law."

[21] Although it is unclear whether the cases in states with only discretionary stays involved the application of such stays, this does not affect my analysis.

[22] Though the plaintiff received monthly payments during the pendency of the appeal, he received no windfall because the trial court adjusted the valuation of the plaintiff's partnership interest under § 34-362 by "allowing a credit [from the buyout price] for the monthly payments made to the plaintiff from October 2006 through August, 2009 . . . given the unique circumstances of this case under the principles of equity."

[23] The defendants also claim that the trial court improperly admitted into evidence and allegedly relied upon the defendants' 2010 offer letter, sent pursuant to § 34-362 (f), for purposes of determining the date of dissociation. "[I]t is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . When reviewing a decision to determine whether the trial court has abused its discretion, we make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 97–98, 74 A.3d 1242 (2013). My review of the record indicates that the trial court clearly did not decide that September 27, 2006, was the date of dissociation based solely on this letter and, even if admitting the letter had been improper, any impropriety was harmless.

[24] Section 8 (f) of the partnership agreement provides: "The partnership

shall, to the extent of partnership assets only; indemnify and save harmless each [p]artner from and against all liability, loss, expense, or damage incurred or sustained by reason of any act or omission in the conduct of the business of the partnership except if such [p]artner shall have been guilty of fraud or gross negligence, including indemnification by the partnership against the reasonable expenses, including attorney's fees, actually and necessarily incurred by any of [the partners] in connection with the defense of any action to which any of them may be made a party by reason of his activities on behalf of the partnership."

25 "This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged, we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 58.

26 Lehn offered the following testimony on direct examination:

"[The Defendants' Counsel]: Were there any issues that arose, I suppose you're aware of, in connection with [the partnership's accountant] putting that balance sheet together?

"[Lehn]: Yes. . . . The one open item was the value of the real estate, which obviously is the primary issue in this case."

27 Lehn offered the following testimony on cross-examination:

"[The Plaintiff's Counsel]: And then in your formulation you deducted $2 million as an offset, correct?

"[Lehn]: Correct.

"[The Plaintiff's Counsel]: And that was to represent *attorney's fees*, loss of partnership income and damage to the partnership's reputation and goodwill, correct?

"[Lehn]: Yes, sir." (Emphasis added.)

28 The defendants' valuation expert, Kevin Vannucci, offered the following testimony:

"[The Plaintiff's Counsel]: And then you came to a total value of the real estate investment; am I right?

"[Vannucci]: Yes . . . .

"[The Plaintiff's Counsel]: Okay. Then you took a 3 percent selling cost?

"[Vannucci]: That is correct.

"[The Plaintiff's Counsel]*: And then you deducted the balance on the mortgage on the property?*

"[Vannucci]: *We deducted the liabilities that existed that I was—information I was shown, so, yes, we deducted those liabilities. We deducted notes payable, second line after that shows tenants' security deposits deducted.*" (Emphasis added.)

The plaintiff's valuation expert, Kenneth Pia, testified that "[the partnership] is a box. And it's an entity that is filled with various assets and *two liabilities*. The assets are in the form of real estate and there's a little bit of cash as well and *the liabilities are, simply, the mortgage related to the real estate and the tenant security deposits, as it is a real estate intensive entity.*" (Emphasis added.)

29 On May 24, 2012, counsel for the defendants made the following representation to the trial court: "We had intended to call an accountant for the partnership . . . . [Plaintiff's counsel] and I have stipulated to certain values that he would testify to, and I'm prepared to read those into the record at this time. . . . [I]f [the partnership's accountant] were here, he would testify to these three numbers as of these dates. . . . [A]s to the date of August 18, 2009, cash on hand, $247,953. On the same date, the note payable amount would be $3,066,133, that function is a liability. And second liability would be the tenant lease deposits at $148,493. . . . As of September 30, 2006, he would testify to the following numbers: cash on hand, $374,942, the mortgage payable on that date would be $3,480,527, and the tenant lease deposits that were owed would be $149,056." Thereafter, counsel for the plaintiff confirmed this agreement, stating: "Your Honor, we so stipulate those [six] numbers."

30 Specifically, Lehn testified as follows:

"[Lehn]: The partnership records, both for 2006 and 2009, and today, *do not reflect any liability on the books and records of the partnership for the amount* [*of attorney's fees*] *owed to the estate.*

"[The Defendants' Counsel]: And do you know why they have not been booked yet by the partnership?

"[Lehn]: *Because the partnership's position is that* [*the plaintiff*] *is liable for those fees*, so it would be—it would be an asset and an offsetting liability if—if it's a receivable from [the plaintiff] and offsetting liability from the partnership, so it wasn't worth putting both numbers on there. But obviously *if* [*the plaintiff*] *did not pay, then there would be a liability for the partnership*." (Emphasis added.)

[31] Specifically, Lehn testified as follows:

"[Lehn]: Well, obviously from these partners' perspective, *we felt that* [*the plaintiff*] *would ultimately be responsible for* [*the attorney's fees*], but . . .

"[The Defendants' Counsel]: In the meantime, who was going to pay the fees?

"[Lehn]: The estate would on behalf of the partnership and the partners. . . .

"[The Defendants' Counsel]: [I]n connection with the attorneys' fees, what does the estate expect in terms of repayment of those fees?

"[Lehn]: Well, *it expects that* [*the plaintiff*] *will repay those* [*attorney's*] *fees to the partnership*, which will then repay those fees to the individual law firms—to the estate.

"[The Defendant's Counsel]: Has the estate made demand on the partnership to this date to reimburse it for the fees?

"[Lehn]: No.

"[The Defendant's Counsel]: Okay. And why not?

"[Lehn]: Again, because *we're hopeful that this court will find that* [*the plaintiff is*] *responsible, and so that the fees will come through* [*the plaintiff*] *rather than through the partnership directly*.

"[The Defendant's Counsel]: And on what basis do you seek to have [the plaintiff] repay those fees—pay those fees to the estate?

"[Lehn]*: That's under* [*§§ 34-362 and 34-356*], *providing for a damage offset to the amount that* [*the plaintiff*] *is entitled to from the partnership*. . . .

"[The Defendants' Counsel]: And if [the attorney's fees become] *a liability for the partnership, how is it that the estate would expect to be repaid?*

"[Lehn]: Well, if the partnership is required to pay back the estate and is not paid by [the plaintiff], then there is not sufficient cash at this time. The partnership will have to pay back the amount due to the estate over some extended period of time. We haven't worked out the details yet, but it's clear that there's not enough cash available to do that now." (Emphasis added.)

[32] Specifically, the defendants' pretrial memorandum, dated May 4, 2012, contained the following statement: "The defendants have countersued to recover attorney's fees, for example, *not only as 'damage' of wrongful dissociation* but as part of the written indemnity provided for under the partnership agreement." (Emphasis added.)

[33] Specifically, the defendants' posttrial memorandum, dated August 3, 2012, contained the following statement: "Pursuant to the plain language of the partnership agreement, the defendants are entitled to be indemnified by the partnership for legal fees incurred in these actions." The defendants, of course, mentioned attorney's fees *as damages* multiple times during posttrial briefing.

[34] The plaintiff noted as such in his posttrial reply brief, stating: "Finally, even if the defendants could prove that the [p]artnership is liable to the partners for the legal fees, [the plaintiff] would not be responsible for the entire amount of legal fees. Instead he would be liable solely for his share . . . of the legal fees incurred." The reply brief continued: "Accordingly, if the defendants are entitled to attorney's fees pursuant to the [p]artnership agreement, then [the plaintiff] is as well."

[35] The plaintiff presented his own claim for attorney's fees pursuant to § 34-362 (h), which the trial court denied. Had the defendants presented their claim to attorney's fees as a liability at trial, I do not doubt that the plaintiff would have argued for inclusion of his attorney's fees in that figure. See footnote 34 of this concurring and dissenting opinion. Indeed, had the defendants presented their claim for attorney's fees as a liability at trial, the trial court might have addressed a variety of other issues, including, but not limited to: (1) whether and to what extent the plaintiff's attorney's fees could be included in the liability; (2) the reasonableness of all parties' attorney's fees; (3) whether the partnership agreement requires the individual partners, and not the estate of Richard Aiello, to *actually* pay their own attorney's fees—not just owe their attorney's fees to the estate—in order to incur a liability pursuant to the terms of the indemnity provision, which allows indemnity for "attorney's fees, *actually* . . . incurred by any of [the partners]"; (emphasis added); (4) the accounting practices of the partnership in booking liabilities; (5) the validity and effect of two agreements purporting to obligate the partners and/or the partnership to reimburse the estate of Richard Aiello for attorney's fees paid; and (6) the effect of § 34-362 (d),

which provides that "[a] partnership shall indemnify a dissociated partner whose interest is being purchased against all partnership liabilities, whether incurred before or after the dissociation, except liabilities incurred by an act of the dissociated partner under section 34-363."

[36] In partnership accounting actions, courts frequently encounter arguments about the characterization of partnership assets and liabilities. For example, "[p]artnerships will frequently seek to characterize contributions as advances rather than capital, in order to obtain a higher priority or interest. Characterization of the contribution presents a factual question as to the parties' intent." 2 A. Bromberg & L. Ribstein, Bloomberg and Ribstein on Partnership, supra, p. 6:32; see also id., p. 6:44 (characterization issues for liabilities and rights to indemnification). Upon dissociation or dissolution, valuation and characterization disputes invariably center upon the partnership books and records. See 2 A. Bromberg & L. Ribstein, Bloomberg and Ribstein on Partnership, supra, pp. 7:189–7:191 ("[U]nless otherwise provided in the partnership agreement, the starting point for valuation of the outgoing interest is the capital and [if separately maintained] income accounts on well-kept partnership books. These are adjusted for appreciation and depreciation of assets and other matters adjudged in an accounting action. The value of assets may be determined through expert testimony and such evidence as prior sales of assets." [Footnotes omitted.]).

When the parties acquiesce to use of well-kept partnership books and records as the bases of an accounting or an appraisal, courts may properly decline to disturb the parties' characterizations of partnership items in the absence of compelling evidence to the contrary. In *Kerasotes* v. *Estate of Kerasotes*, 238 Ill. App. 3d 1020, 1027, 605 N.E.2d 643 (1992), for example, the Appellate Court of Illinois rejected the contention that the trial court should have characterized a parent partnership's asset as the asset, instead, of a subsidiary company. The court declined to do so, noting that, for many years, the parent partnership's financial statements had treated the asset as an asset of the parent partnership. Id. The court noted that "[t]he audit reflected this, and these amounts were included in determining the net assets of [the parent partnership]. It does not sit well for [one of the members of the subsidiary company], who was the president and chief executive officer of [the parent partnership], to now allege the accounting procedure employed for many years was incorrect and that he did not know that the [asset, composed of advertising revenue and soft drink rebates] would be included as revenue of [the parent partnership]." Id. The court noted that the parties had acquiesced, via a dissolution agreement, to the manner of the audit, relying on "audit of the books and records of the partnership . . . to certify the assets and liabilities of each partnership." Id. The court held that the members of the subsidiary company were "bound by this agreement and cannot now disregard the terms of [the dissolution agreement] simply because [the members of the subsidiary company] have discovered the terms are less profitable to them than they anticipated when they entered into it." Id.; see *Cowan* v. *Maddin*, 786 S.W.2d 647, 658 (Tenn. App. 1989) ("It is not inequitable to plaintiff to continue treating prepaid expenses in the same manner as those expenses had been treated from [the beginning of the partnership in 1974 to the date of dissolution in 1986]. The plaintiff has had the benefit of that treatment over the years . . . ."); see also *Dawson* v. *White & Case*, 88 N.Y.2d 666, 673, 672 N.E.2d 589, 649 N.Y.S.2d 364 (1996) (affirming trial court's exclusion of unfunded pension plan payments from calculation of the partnership liabilities in part because partnership "never included the unfunded pension plan as a liability in the firm's financial statements").

Because the defendants chose the damages theory of entitlement to attorney's fees, the record is insufficient for this court—let alone the trial court— to decide whether the partnership's failure to characterize the attorney's fees as a liability throughout the many years of ongoing litigation now should be disregarded at the defendants' own request. See footnote 35 of this concurring and dissenting opinion. As to evidence of characterization, in *Cowan*, the court relied upon findings of a Special Master, who specifically took proof "regarding the manner in which the partnership had treated prepaid expenses," including testimony from the partnership's accountant. *Cowan* v. *Madden*, supra, 786 S.W.2d 657. Unlike in *Cowan*, the defendants in the present case have not offered proof as to the manner in which the partnership has treated attorney's fees, or liabilities in general, in the past. As to selectively-asserted accounting methods, in *Dawson*, the Court of Appeals of New York affirmed exclusion of a law firm's unfunded pension plan payments from the firm's liabilities, agreeing with the Appellate Division's reasoning that "[t]he purported multi-million dollar liability never appeared in any of [the] defendant's financial statements and was never assessed against either defendant or any of its partners for accounting purposes. *It is only against plaintiff that defendant seeks to impose this*

*burden*. The unfunded plan was, and is, if anything, a future, not a current, liability . . . ." (Emphasis added.) *Dawson* v. *White & Case*, 212 A.D.2d 385, 386 (N.Y. App. 1995). Like the defendant in *Dawson*, the defendants in the present case only seek, after an unfavorable ruling by the trial court, to impose the burden of attorney's fees as a liability *against the plaintiff*.

———————————————